2020 IL App (1st) 181889-U

THIRD DIVISION
June 30, 2020

No. 1-18-1889

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| COUNTY OF COOK, a body politic and corporate, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee/Cross-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 12 L 8066 |
| USI INSURANCE SERVICES CORP OF ILLINOIS, | ) | |
| INC., an Illinois corporation, | ) | Honorable |
| | ) | Thomas R. Mulroy, |
| Defendant-Appellant/Cross-Appellee. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The County's complaint was not time barred in violation of the statute of limitations; (2) the trial court did not err in denying USI's motion for judgment notwithstanding the verdict on the jury's findings on breach of contract and setoff; (3) Cook County's request for an *additur* or a new trial on special damages is denied; (4) the trial court did not err in denying Cook County's motion for judgment notwithstanding the verdict on the jury's finding on mitigation; and (5) the trial court's finding in favor of USI on Cook County's claim of breach of fiduciary duty was not against the manifest weight of the evidence.

¶ 2    This appeal arises from a breach of contract and breach of fiduciary duty action filed by plaintiff Cook County (the County) against defendant USI Insurance Services Corp of Illinois, Inc. (USI) relating to USI's role as the County's insurance broker. Following a jury trial on the breach of contract claim, the jury found in the County's favor that USI breached its contract with the County and awarded damages of $9.05 million. A bench trial was conducted on the breach of fiduciary duty claim and following the trial, the trial court entered judgment in favor of USI finding no breach of fiduciary duty by USI. Both USI and the County have appealed.

¶ 3    In USI's appeal, USI argues that the trial court erred in denying USI's motion for judgment notwithstanding the verdict (JNOV) because (1) the County's action was barred by the statute of limitations; (2) the County's excess insurance policy provided coverage and there was no evidence that a different insurance carrier would have responded differently; (3) there was no evidence that USI breached its contract with the County; and (4) the County's monetary judgment should be offset by the County's recovery from the insurance companies.

¶ 4    In the County's cross-appeal, the County argues that: (1) this Court should reverse the jury's award on special damages and award the County $32.5 million in special damages, or remand for a new trial on special damages only; (2) this Court should reverse the jury's finding that the County failed to mitigate its damages; and (3) the trial court's judgment in favor of USI on the breach of fiduciary duty claim was against the manifest weight of the evidence.

¶ 5    Since this appeal involves insurance coverage related to multiple lawsuits, we will begin with an overview of the case. Prior to 2007, the County was self-insured up to $10 million and carried excess liability insurance above that amount. In 2006, the County carried two layers of excess liability coverage of $5 million each from Clarendon America Insurance Company (Clarendon) and Insurance Company of the State of Pennsylvania (ICSOP), a wholly owned

subsidiary of American International Group (AIG). During 2006, the County reassessed its insurance needs and decided to increase its excess liability coverage to a total of $20 million. The County sent out a request for proposals (RFP) to find an expert to help the County obtain the most appropriate policies for its needs.

¶ 6     After considering the RFP submissions, the County selected USI as its insurance broker and entered into a contract for USI to procure excess liability insurance for the term running from December 31, 2006 to December 31, 2007 (2007 policy period). The County had previously worked with USI as an insurance broker for several years. Ralph Wilson, the executive vice president of USI, acted as the County's broker.

¶ 7     USI informed the County that it had secured a $10 million policy with Illinois National Insurance Company (Illinois National), a second wholly owned subsidiary of AIG, as the first layer of excess coverage and a second layer policy with Lexington Insurance Company (Lexington), another subsidiary of AIG, for an additional $10 million in coverage. The selection of these policies was included in the parties' contract in Attachment B. The County agreed to the policies and submitted the premium of approximately $2.2 million to USI for the policies, of which $400,000 was a commission to USI. Of this amount, the premium for the Illinois National policy was $1.4 million. USI also received a $200,000 fee payment from the County.

¶ 8     On December 28, 2006, AIG issued a policy binder for the 2007 policy period with Illinois National for the $10 million excess liability coverage in accordance with the contracts. When the policy issued in mid-May 2007, the named insurer was not Illinois National, but instead was ICSOP, the AIG subsidiary that had been the excess carrier for the previous year. The policy was submitted to the County in late June 2007.

3

¶ 9    One of the reasons the County sought to increase its liability insurance was an increase in lawsuits and higher judgments. In January 2006, a lawsuit was filed against the County by former detainees of the Cook County Jail alleging that the jail's strip search policy was unconstitutional (the Young Lawsuit). The Young Lawsuit alleged a potential class action and other claims amounting to millions of dollars in liability if proved. When the Young Lawsuit was filed, the County had the excess insurance policy issued by ICSOP. In May 2007, the federal court certified the Young Lawsuit as a class action which dramatically increased the potential for liability to the County. When the County sought coverage, ICSOP provided coverage under the 2006 policy, but refused to provide coverage for the 2007 policy claiming that the Young Lawsuit was a continuous occurrence and therefore not covered. When ICSOP refused to pay, Lexington contended that it did not have to pay its coverage because it was only obligated if ICSOP paid its limits. In 2010, the Young plaintiffs reached a settlement with the County. The County agreed to pay $55 million in cash, which included $10 million from the 2006 excess insurance policies, and assigned its rights to the Young plaintiffs to pursue the excess liability insurance from the 2007 policy period. The County and the Young plaintiffs agreed to allocate any recovery 75% to the Young plaintiffs and 25% to the County.

¶ 10    In 2012, the County and the Young plaintiffs filed an action against the insurance companies, including ICSOP and Illinois National as well as different AIG named entities (AIG Lawsuit) alleging violations of the False Claims Act, breach of contract, tortious interference, fraud, and fraudulent concealment. Following a jury trial in 2016, the jury found in favor of the plaintiffs. Ultimately, in May 2017, the AIG Lawsuit was resolved through a settlement agreement before any appeals. The insurance companies agreed to pay $52 million to the plaintiffs, which the parties allocated over various claims and types of damages. As part of the

settlement, the jury verdict and any posttrial orders by the trial court were vacated.

¶ 11    On July 19, 2012, the County filed its lawsuit against USI that is at issue in this appeal. The complaint alleged a breach of contract and a breach of fiduciary duty by USI. The second amended complaint, filed on July 25, 2017, alleged the following in the breach of contract count.

¶ 12    In 2006, Wilson, on behalf of USI, represented to Cook County that he had a special relationship with AIG as well as expertise in the types of insurance Cook County was seeking. Wilson represented to the County that he would be able to devise an insurance program that would protect the County from claims, including new claims that might later be alleged in the Young Lawsuit. USI and the County entered into a written contract for risk management services, which was dated December 19, 2006. USI executed the contract on January 10, 2007, while it was approved and executed by the Cook County Board of Commissioners on February 6, 2007.

¶ 13    Section I of the contract detailed the "Scope of Services" governed by the contract. This section included the following language:

> "Contractor shall recommend the placement of coverage with excess liability carriers willing to issue policies designed to suit the specific and unique needs and requirements of the County, including the special policy terms required by the County and described in Part III, Special Conditions. Subject to County approval, Contractor shall place, bind and purchase such policies on the County's behalf. In providing these Services, Contractor shall at all times act in the County's best interest. Contractor shall assign highly qualified and experienced Contractor personnel, or approved subcontractors, to the performance of the Services required under this Contract."

¶ 14    Under section SC-03 of the special conditions section of the contract, USI was required to "place, bind and transmit premiums for the purchase of excess liability insurance with a coverage period commencing on December 31, 2006" and the municipal excess liability policies "shall be consistent with the description set forth on Attachment B, which is incorporated and made a part of this Agreement as if fully set forth herein."

¶ 15    Attachment B provided that the initial excess policy was to provide $10 million of excess coverage for wrongful acts and be issued by Illinois National. The policy was to include the following limit: "$10,000,000 [for] any one occurrence or wrongful act or employee benefit wrongful act or series of continuous repeated or related occurrences or wrongful acts or employee benefit wrongful acts in excess of your retained limit."

¶ 16    The complaint further alleged that during the process of selecting and purchasing excess liability insurance, USI met with County officials to discuss the policy needs. These discussions included "an examination of the County's portfolio of pending cases, including, among others, the Young Lawsuit." The complaint asserted that when the policy finally issued, ICSOP was the insurer and the premium intended to be paid to Illinois National had been paid to ICSOP by USI. According to the complaint, USI (1) failed to recognize how important getting a new policy from a new insurer was and (2) failed to advise the County as to the potential implications and consequences of USI's failure.

¶ 17    During the 2007 policy period, the Young plaintiffs asserted new claims, but when the County sought coverage, ICSOP refused to provide coverage and reserved its right to deny coverage. It was ICSOP's position that the new claims raised in 2007 were barred under section 3F of the insurance policy which stated that "[a]ll occurrences arising out of continuous, repeated, or related occurrences shall be treated as one occurrence." Further, under section 3F,

the $5 million insurance limits in effect when the first claim was reported to ICSOP would apply. Since the Young Lawsuit was first reported to ICSOP during the 2006 policy period, ICSOP asserted that only the policy limits from the 2006 policy period were applicable. The County alleged that this was "an argument that ISCOP could only have made if ICSOP was the insurer in both policy periods so that the 'parties' to both policies were the same," whereas Illinois National would not have been able to take this position.

¶ 18    The County asserted that if USI had not breached its contract, then the County would have been able to retain the settlement from the AIG Lawsuit. Instead, 75% of the settlement was allocated to the Young plaintiffs. Of the $52 million settlement, the County was allocated $10.8 million while $32.5 million went to the Young plaintiffs. Further, of the $10.8 million the County received, only $1.45 million was recovered from compensatory damages.

¶ 19    The complaint alleged that at the time of the contract with USI, it was reasonably foreseeable that (1) if USI failed to procure the correct insurance policy, then the County would be required to assign any claims against the insurers; and (2) "the County could face lawsuits presenting catastrophic, excess exposure that could result in a settlement or judgment in excess of the County's self-insurance levels." The County fully performed its obligations under the contract while USI was required under the contract to exercise ordinary care and skill in procuring insurance coverage for the County from Illinois National. The County asserted that as a result of USI's breach, it suffered between $20 and $60 million in actual, consequential, and incidental damages as well as attorney fees and costs.

¶ 20    The breach of fiduciary duty count realleged the prior allegations and further asserted that under section 2-2201 of the Code of Civil Procedure (735 ILCS 5/2-2201 (West 2010)), USI owed the County a fiduciary duty to appropriately apply the premium received from the County.

USI breached its fiduciary duty by incorrectly procuring and paying the premium for an ICSOP policy, rather than the Illinois National policy. The County sought actual, consequential, and incidental damages up to $20 million as well as punitive damages for USI's reckless conduct.

¶ 21    In its answer to the second amended complaint, USI raised several affirmative defenses, including the statute of limitations, judicial estoppel, an argument that section 2-2201 bars a claim of breach of fiduciary duty, the County failed to perform conditions precedent to the contract, the County failed to mitigate its damages, ratification of the insurance policy with ICSOP, the contract's integration clause barred the County's allegations, the County was seeking double recovery following its settlement in the AIG Lawsuit, and any monetary award for the County was subject to a setoff based on the AIG Lawsuit settlement.

¶ 22    A jury trial on the breach of contract count was conducted in March 2018. The following evidence was presented.

¶ 23    Frank Catania testified that he worked for the County as an assistant State's Attorney (ASA). He discussed the type of lawsuits brought against the County, such as, medical malpractice and negligence for accidents on County property, as well as the frequency in which it is sued. Catania explained that the County is self-insured to $10 million, but the County purchased excess liability insurance beyond that amount. The self-insured amount is considered the deductible on the excess liability policies and is called a self-insured retention (SIR).

¶ 24    Catania stated that the County plans in its budget for upcoming lawsuits to assess what lawsuits the County is facing and to estimate the result and costs. Prior to 2006, the County never needed to use excess liability insurance. The amounts needed remained under the SIR. Around 2006 to 2007, Catania explained, "the County's needs were evolving at that time, and we were seeing a series of large cases or cases with large demands coming toward us and a lot of cases

that included class action claims." The County made a decision to double its excess liability coverage beginning in the 2007 policy period, from a total of $10 million in two layers to $20 million in two layers.

¶ 25    To achieve the increased coverage, the County hired USI because according to Catania, the County was not an expert in obtaining insurance and wanted an expert to assist. The County "asked for people to propose how they would obtain insurance for us, request for proposals, and they returned to us with some proposals. USI is the one that won out on that."

> "The need for having a professional is based on this: We need to have someone out there who is familiar with municipal policies because this is a government that is a large, complicated government. We needed to be able to find an insurance broker that would be able to help us, advise us and steer us or be our stewards to help us figure out how much we actually need to set aside for reserves, how much we need to anticipate and then to find policies that would meet those needs."

¶ 26    The County had a relationship with USI that went back to 2001. The advantage of having a longstanding relationship with an insurance broker was that the broker was better able to understand the County's needs. The County would routinely provide

> "a document called a loss run or bordereau, which would describe the things that are affecting the County, including things like claims for workers' comp for that type of insurance, claims for traffic crashes, claims involving lawsuits against the County or County officials."

¶ 27    Catania described the contract between the County and USI as follows.

> "The contract provided each side would have obligations. The County's obligations would be to tender its premium payment to USI and that we would

provide information to USI over the pendency of the contract, that that would be necessary for them.

In addition, it provided that USI is obligated to provide us with stewardship with directing us as to what our needs were or should -- or what we should anticipate and how -- and they would also be responsible for providing information to the insurance company that we provided to them.

So they are the intermediary that would provide our information to AIG in this case. The information would flow through them."

¶ 28    Catania also testified about terms in the contract, including Attachment B, which specifically named Illinois National as the insurance carrier. He noted that section SC-02, part B3 stated: "The contractor was obligated to review the policies received from the carriers immediately upon their receipt and verify that the terms conformed to the provisions of this contract and any additional requirements communicated." The contract provided that USI was supposed to act in the County's best interest. The County communicated its needs to USI through Wilson, including in the loss run which "describes specifically what our needs were based on, the amount of cases and value on those cases over a period of time." According to Catania, the terms "loss run" and "bordereau" are essentially the same thing, a list of pending cases. Catania testified that the Young Lawsuit was included in the loss run and listed an estimate of $500,000 as the potential cost of the claim. Initially the Young Lawsuit consisted of three plaintiffs. According to Catania, this estimate was based on prior cases challenging the jail's strip search policy and the County had prevailed in those earlier cases.

¶ 29    Catania explained that the County received an insurance binder from Illinois National on December 28, 2006. An insurance binder is:

10

> "a document that describes the insurance company, the limits of coverage, the term of the policy year or portion of the year. That information is all on one sheet or maybe multiple sheets which basically says there is a contract with the company that's named."

However, when the County received the policy several months later in 2007, Illinois National was not listed as the carrier, the carrier was ICSOP. Catania stated, "USI explained to me and others at the County that [the policy] came in under a different name, and they did not explain what that meant." Wilson told Catania that the insurance companies were part of the same insurance family and "it didn't make a difference about the name." Catania learned in 2010 that the name of the insurance company mattered. The County had relied on Wilson's statement that the name of the insurance company did not make a difference.

¶ 30    The Young Lawsuit was certified as a class action in April 2007. Catania testified that in 2009 and 2010, the Young Lawsuit was involved in damage test cases in the federal court that found in favor of the plaintiffs. The County realized that as a class action, the amount of claims and payments could amount to over a billion dollars. The County decided to try to settle the Young Lawsuit in 2010. According to Catania, the County

> "determined what we had available in terms of available funds to pay a deductible and pay in excess of the deductible. We looked at what insurance was available to us to pay additional funds, and we looked at the most recent demand that was brought by the plaintiffs in the case for the amount of money that they would be willing to discuss settling the case."

¶ 31    The most recent demand at that time from the Young plaintiffs was $80 million. At that time, the County had its $10 million SIR as well as the $5 million excess insurance from each of

the 2006 policy period insurers, Clarendon and ICSOP. Catania participated in the settlement

negotiations. He believed the 2007 policy period insurance would cover a wrongful act that

occurred in that year and sought coverage to include in the settlement. Wilson advised Catania

that "AIG would fight us at every turn on the issue." AIG was the umbrella company that owned

Illinois National, ICSOP, and Lexington. Lexington's coverage was not triggered until the first

layer of excess insurance was paid. Wilson told Catania that

> "the insurance companies were basically sticking to the point that those moneys
>
> were not available but that he could talk with the people that he knew at AIG and
>
> perhaps work something out in order to allow us access to those funds."

Wilson was unable to get AIG or the individual subsidiaries to provide the funds.

¶ 32    Catania then discussed section 3F of the insurance policy, which stated, "The limits of

insurance in effect when the first claim or suit is made and reported to us shall apply." Catania

testified that the term "us" in this section was relevant in the switch from Illinois National to

ICSOP. Catania explained:

> "If the insurance company is Illinois National, that's not the same 'us' as ICSOP.
>
> If you place ICSOP over Illinois National, the insurance company that was first
>
> notified of the claim or suit and reported to ICSOP would have been the same
>
> insurance company under 2006. So it made a difference to have it under 2007."

¶ 33    Catania also discussed his communications with the insurance companies.

> "The insurance company, throughout the litigation, had been sending me what we
>
> call reservation of the rights letters that they were going to try a variety of
>
> different reasons to explain why there was no coverage, reserving our right, and
>
> with all of those communications, they always left it open to future discussions.

So they never told me during this period of time that they were denying us any insurance."

¶ 34    In the negotiation with the Young plaintiffs, Catania received a letter from their attorneys indicating a willingness to discuss settlement for an amount less than $80 million. Catania stated that he only had $30 million available at that time, but he did have the ability to assign the rights to pursue insurance claims. The Young plaintiffs were interested in the idea of the assignment. Catania was unable to assign a value to the assignment. Wilson told the County that the assignment had zero value because AIG would "fight tooth and nail" that this was not covered in the policies. The County hired outside counsel to assist in the insurance coverage matters.

¶ 35    Catania further testified about new claims made in the Young Lawsuit. In 2007, the sheriff changed the procedure at the jail by providing privacy screens, but failed to properly utilize them. Catania asserted that this was a new occurrence for insurance purposes and should have triggered coverage in the 2007 policy period, but the insurance companies refused to provide the funds. Catania believed that the County would have been in a stronger bargaining position during negotiations if it had the $20 million from the 2007 policy period insurance policies. In the negotiation, the Young plaintiffs were unwilling to take the $55 million in cash that was offered by the County, which included the $10 million from the 2006 policy period policies. The County added the assignment to the settlement offer. Catania later renegotiated with the Young plaintiffs regarding the assignment to allow the County to recover some proceeds against the insurance companies. The parties agreed to split any recovery with 75% to the Young plaintiffs and 25% to the County. The judge assigned to the Young Lawsuit in the federal court eventually approved the settlement.

¶ 36    At the AIG Lawsuit trial, both Illinois National and ICSOP were named as defendants.

Catania summarized the arguments of the Young plaintiffs.

> "The Young plaintiffs were claiming that the insurance companies that
> were involved committed a fraud against the County by switching policies on us
> from the Illinois National Insurance Company to the [ICSOP], and that that made
> a difference, depriving us of the insurance proceeds, and that they told us that it
> did not make a difference in various writings that constituted a false claim and
> constituted fraud.
>
> They were also in violation of the contract that we had with them, which
> was the insurance policy. We were also going after them for punitive damage and
> prejudgment interest."

¶ 37    Catania further explained what the False Claim Act was.

> "The False Claims Act is an Illinois statute, which mirrors a federal statute, which
> basically says you cannot lie to a government or government official in order to
> deny them a benefit that's rightfully theirs or to cause them to do something that
> they would be required -- that you would be required to do under the law.
>
> So, in order to prevent fraud from being perpetrated on the government,
> this statute allows anyone that knows of it, to raise a claim in court and sue them.
> As a penalty built into the statute, damages, the amount of money that is
> recovered are then multiplied by three. It's called treble damages, and that's
> where the penalty of lying to the government really takes hold."

¶ 38    The jury found in favor of the County, but the trial court vacated a portion of the verdict

following posttrial motions. Later, all the judgments were vacated when the parties in the AIG

Lawsuit settled for $52 million. Under the settlement, the County received around $10 million

while the Young plaintiffs received $32.5 million. The remainder of the settlement funds were allocated to the State of Illinois entities. Catania testified that the County did not receive any benefit for the premiums it paid for the insurance policies.

¶ 39     During cross-examination, Catania agreed that the contract with USI did not specifically require USI to procure insurance to cover the Young Lawsuit. Catania also agreed that section SC-05 of the contract required the selected insurance carrier to be rated as A- and Class VII or higher, but did not specifically name Illinois National. Section SC-04 of the contract allowed the County's director of risk management 60 days to review and approve the policy. Catania did not participate in that review of the policies.

¶ 40     Ralph Wilson testified as an adverse witness for the County. According to Wilson, "[a]n insurance broker is like a matchmaker. You have a client and you match them up to the best insurance companies for the benefit of the client." USI is one of the top ten insurance brokers in the world. The insurance broker represents the client and its interests. Wilson first submitted an RFP to the County in 2000. Over the years, Wilson became familiar with the County's needs. USI received a $200,000 fee and up to $400,000 in commissions as payment for each year it worked with the County. The County trusted Wilson to find the best policy for its needs. He understood the County's needs were changing on an "aggregate basis." He did not understand that the County's needs were changing due to higher verdicts, but due to the frequency of the claims. Wilson also maintained a good relationship with AIG, as well as other insurance companies.

¶ 41     In 2006, Wilson submitted an RFP which listed Illinois National as the insurer to the County, but he stated that it was a proposal, not a promise, to obtain an Illinois National policy. Wilson set forth in the RFP that he was the team leader for USI and would be responsible for all

aspects of risk management and insurance services for the County. He testified that he went to AIG because the company exceeded the insurance ratings and AIG selected which subsidiary provided the insurance.

¶ 42      When asked whether Attachment B to the USI contract required Illinois National as the carrier, Wilson denied that the contract named Illinois National as the carrier, and responded that the contract provided for a company "consistent" with the ratings of A- VII, and did not provide an exact name. Wilson further testified that the contract required USI to submit the County's payment to the carrier approved by the County, and that was AIG. The insurance binder issued with Illinois National as the carrier. Wilson stated that Illinois National is an issuing company, but any claims would have been handled by AIG.

¶ 43      On May 14, 2017, AIG changed the issuing company to ICSOP. Wilson and USI found out about the change when USI received the new policy on or about May 16, 2007. Wilson did not ask AIG why the issuing company changed and he did not care why AIG changed the policy. When asked if he would have been concerned to learn that AIG changed the issuing company to ICSOP two days after the Young Lawsuit was certified as a class action, Wilson answered no. Wilson did not notify the County of the change upon receipt of the policy. USI reviewed the policy and noted the change in the issuing company when the policy was submitted to the County on or about June 26, 2007. When asked why USI waited until the end of June to notify the County of the change in carrier, Wilson responded, "The name made no difference."

¶ 44      Wilson maintained that the County received the policy for which it paid. When asked if USI gave the County the choice to have the carrier back, Wilson answered:

> "I believe they had 60 days to review it. If they wanted to change it, we would
> have. But the name of the insurance company made no difference or the issuing

16

company, I should say. The company remained AIG."

¶ 45    Wilson agreed that later in response to the Young Lawsuit, AIG and ICSOP took the position that the 2006 policy period limits applied, but the policy from the 2007 policy period was not applicable. Wilson responded that AIG did not pay under the 2007 policy period because the one occurrence took place in 2006. The insurance company's position was that all occurrences arising out of the same continuous pattern counted as one occurrence. Wilson disputed the findings in the AIG Lawsuit, he asserted that the County and the Young plaintiffs were able to prove more than one occurrence, not whether the switch in insurance carriers made a difference. If the change in policies made a difference, Wilson would have been obligated to tell the County. The County had the right to rely on Wilson's representation that the name of the carrier did not matter.

¶ 46    When asked if Wilson "went to bat" for the County with AIG about the Young Lawsuit, Wilson testified as follows:

> "I told them that we needed to prove that there was more than one occurrence so that they would pay. AIG had already said we're not going to put up more than one set of limits for the Young case, it's one occurrence."

¶ 47    Wilson was then asked if he argued with AIG and ICSOP and Lexington to provide the $20 million in coverage for the Young Lawsuit, and he responded, "For a new occurrence I did. Not for the Young case because the Young case was one occurrence in 2006, sir." Wilson advised the County to renew its insurance with AIG during the settlement negotiations on the Young Lawsuit because it would not be in the County's best interest to change while claims were pending. He also suggested that the County retain USI as its broker because USI had "the most knowledge and experience about the claim." Wilson admitted that USI's knowledge and

experience did not assist the County in seeking the policy limits for the 2007 policy period. Wilson also urged the County to renew with AIG for future policies "[b]ecause if AIG felt like they had a partner, they might be more receptive to our arguments that there was more than one occurrence and they would pay the limits for 2007." Wilson maintained that the change in name from Illinois National to ICSOP did not make a difference because both were AIG companies. In his opinion, the value of the assignment of rights against the insurance companies had no value because there was no coverage.

¶ 48    Wilson first learned of the Young Lawsuit in the June 2006 claims report, which listed the case and showed a $500,000 reserve. He was not concerned about the case because the reserve fell within the County's SIR. Later, when considering insurance policies for 2007, he was not asked to provide insurance for the Young Lawsuit. According to Wilson, the policies of the 2007 policy period would cover unknown losses, and the Young Lawsuit was a known case in 2006. The contract between USI and the County did not include a provision requiring insurance to cover the Young Lawsuit.

¶ 49    Wilson disputed that he promised the County that USI would provide an Illinois National policy. He maintained that USI was to provide a policy consistent with the contract and Illinois National and ICSOP were consistent and both were AIG companies.

¶ 50    Anthony Valiulis testified that he was a retired attorney, but had previously been retained by the County in 2012 to investigate whether USI failed to live up to its obligations under its contract with the County. Valiulis participated in the AIG Lawsuit at trial, but retired before the parties reached a settlement. He summarized the County's position such that under an Illinois National policy in the 2007 policy period, there would have been coverage, but with the ICSOP policy, there was no coverage.

18

¶ 51    Valiulis explained that this position was based on section 3F of the insurance policy.

> "Well, the significance is that last sentence, it says 'The limits of insurance shall apply on the policy in effect when the first claim or suit is made and reported to us.'
>
> 'Us' is the key. If Illinois National is the carrier, 'us' refers to Illinois National. Illinois National did not have a policy with Cook County in 2006.
>
> So the first time any of the claims were reported or the lawsuit was reported to Illinois National, the only policy in effect would have been the 2007 policy. So there would have been coverage if Illinois National was the carrier for claims that were made -- wrongful acts that took place in 2007.
>
> But if ICSOP is the carrier, ICSOP was also the carrier in 2006 on a smaller policy. So that language would say the limits of insurance, when the first claim or suit was reported to 'us,' the 'us' being ICSOP, that would have been reported -- would go back to 2006. That's when the first – that's when this lawsuit was reported to ICSOP and the 2006 claims were reported to ICSOP.
>
> So the $5 million limit of the 2006 policy would preclude any coverage under the 2007 policy, if ICSOP is the carrier. If Illinois National is the carrier, there would be additional coverage. That's what USI never told Cook County, the significance of that."

¶ 52    According to Valiulis, the County suffered $20 million in damages as a result because the County had to pay an additional $20 million out-of-pocket to settle the Young Lawsuit.

¶ 53    Lisa Walik testified that in May 2007, she became the director of risk management for the County. The risk management department oversaw the County's general liability, which

included civil acts, medical malpractice, property, and losses, as well as employee benefits, and workers' compensation.

¶ 54    At that time, USI was the County's insurance broker, which meant that USI "served in a capacity to fulfill insurance obligations, help place the insurance carriers and further advisory capacity." The County used brokers and consultants to help with negotiating with the carrier and to know the emerging trends to keep the County current and compliant. Walik was not an expert in insurance, she was more focused on employee benefits. Prior to becoming head of risk management, Walik did not have much experience in the day-to-day operations of excess liability policies. The County entered into the contract with USI prior to Walik becoming director of risk management.

¶ 55    At the end of June 2007, Walik received the excess liability policy from Nancy McIntosh, a USI vice president. In a letter, McIntosh informed Walik that while the binder had been under Illinois National, the policy came in from ICSOP. According to Walik, the letter "did not specify that there was a difference. I relied on the fact that they were both AIG companies, but we were led to believe that it did not have a material difference." Walik spoke with McIntosh in a phone call around the same time the policy was delivered and Walik asked McIntosh if "there would be any difference," and Walik was told that "it did not matter." Walik testified that if she had been told that the change in carrier mattered, then she would not have approved the policy.

¶ 56    Under the USI contract, one of Walik's responsibilities was to review and approve the insurance policy within 60 days. Walik reviewed the policy with an assistant State's Attorney and Tim Walsh from the risk management department. When asked if she asked USI for any further clarifications on the policy, Walik stated that she believed she asked if the change of the insurance company would make a difference. Walik subsequently approved the policy and never

20

asked USI to cancel the ICSOP policy. Walik was not involved in the subsequent lawsuit alleging a breach of contract against USI.

¶ 57 John Hibbett testified that he was the head of the risk management department for the County from October 2001 until March 2007. Hibbett was the department head when the RFPs for the 2007 policy period were submitted. He explained that USI's duties to the County were to

"to keep the County informed of any changes in the marketplace, go out and procure insurance based on certain parameters that were decided upon through the department of risk management, to cover exposures for the County."

¶ 58 Hibbett had recommended the County raise its insurance coverage for the 2007 policy period, but was not seeking insurance to cover any specific lawsuit in 2007. According to Hibbett, "[i]nsurance was recommended at these levels to provide coverage for defense for claims based off the history of the County and its particular claims." He was unaware of the Young Lawsuit when the County sought insurance for the 2007 policy period. Hibbett was no longer employed by the County when the policy issued in 2007.

¶ 59 Tim Walsh testified that he was employed by the County in the risk management department as the general liability claims manager, which includes prelitigation general liability claims and the financial tracking of litigated claims. He does not have a role in selecting insurance policies, but he does prepare the loss runs of the pending claims.

¶ 60 In May 2006, Walsh had a meeting with Anthony Way, a USI employee, and Catania to discuss two potential class action claims, including the Young Lawsuit. He provided that information to USI for their advice and guidance as to how the County should handle these claims and report them to the excess liability insurers. The June 2006 loss run included the Young Lawsuit with a reserve set by Catania.

21

¶ 61     When the County sought insurance for 2007, the County was not seeking coverage for one particular risk, but rather it wanted coverage for all risks. Walsh was aware that the Cook County sheriff changed its policy for strip searches in February 2007 by introducing modesty panels. However, the sheriff did not follow the policy and use the modesty panels. Walsh understood the sheriff's actions to constitute a new wrongful act.

¶ 62     On cross-examination, Walsh was asked if he remembered receiving a letter in 2008 "from the insurance companies that gave you seven reasons why they were not going to pay under the 2007 policies," and he answered yes. Walsh stated that he did not know whether a change in the name of the insurance company made a difference in this case. Walsh testified that in his 25 years of experience, the County had never used its excess liability coverage. As a result, he had no experience to know what type of things were covered or not under the excess liability policies.

¶ 63     Peter Niedbalski testified that he has worked as a claims administrator for USI since 2006. His responsibilities included reporting claims and receiving updated information on previously reported claims, and forwarding this information to the insurance companies.

¶ 64     According to Niedbalski, in 2006, the County did not tell him that the Young Lawsuit was a risk or a problem, the only information was its inclusion in the reports. In December 2006, Niedbalski emailed Walsh and indicated that the insurance companies wanted more information on a few listed losses, which included the Young Lawsuit. But Niedbalski had no independent recollection of the email or any follow-up conversations at trial. In April 2007, Niedbalski received a letter from Walsh wherein Walsh explained that the Young Lawsuit was worse than the County initially believed and potentially worth a liability of millions of dollars. Niedbalski forwarded the letter to Bob Penny at AIG. In response, Penny emailed Niedbalski and observed

that this was the first notice of the Young Lawsuit, but Niedbalski corrected him to note that the case had been listed in the bordereau when the County sought insurance coverage for the 2007 policy period. On May 14, 2007, Niedbalski emailed Penny several attachments related to the class certification which had been granted. After the class certification, the County increased the reserve to $4 million. On May 16, 2007, AIG changed the insurance carrier for the County from Illinois National to ICSOP. Niedbalski admitted that he never analyzed the policy to determine if the switch mattered. Niedbalski stated that the switch did not have an effect on coverage because the County knew about the loss in 2006 and in 2007 it was a known loss unless a new wrongful act occurred. He was never asked by the County to change the insurance carrier from ICSOP to another carrier.

¶ 65    In seeking to get coverage for the Young Lawsuit for the County, Niedbalski and USI tried to help the County "create a new wrongful act so there would be more insurance, and the insurance company said no." He described this argument as "squishy," but he believed there was some merit to it.

¶ 66    Jeff Ludwig testified the he was USI's president and the designated corporate representative. He signed the contract with the County for USI, but he did not draft the contract. The contract was drafted by the County. The contract included language stating that one of USI's duties was to review and verify the policy language and advise the County about the policy language. He admitted that the contract expressly incorporated Attachment B, which listed Illinois National as the carrier. Ludwig testified that an insurance broker is not in a position to guarantee coverage, rather "[c]overage is determined when claims are made, and insurance companies determine whether or not there's coverage."

¶ 67    Jason Rosenthal testified that he is a private attorney with an emphasis on insurance

coverage. He was hired by the County in May 2010 as insurance counsel in the Young Lawsuit. Specifically, he was retained "to look at the insurance that the county had available or thought it had available and to advise the county with respect to insurance coverage for that lawsuit." One of his goals in his representation was to settle the Young Lawsuit. Rosenthal participated in discussions with AIG concerning coverage for the Young Lawsuit. On August 5, 2010, Rosenthal participated in a settlement conference in which AIG representatives were also present. According to Rosenthal, prior to that date, he believed that the insurance company "had set forth a coverage position which indicated that they did not believe they had an obligation to pay under that policy or that they only thought one policy would respond to the loss." Rosenthal stated that he continued to have discussions with the insurance companies about coverage up until the Young Lawsuit settlement conference.

¶ 68 AIG representatives attended the settlement conference because "the insurance policies represented a source of funds for any potential settlement and because we had hoped and expected that the insurance company was there to offer to contribute additional money to get the case settled." Ultimately, AIG refused to contribute any funds from the policies for the 2007 policy period to the settlement. The Young Lawsuit settled without those funds because the parties

> "were able to negotiate an assignment of the claim that the county had for the
> insurance under the 2007 policy and I believe some additional policies, and we
> agreed that -- we negotiated the assignment of those rights to the class, and that
> assisted in getting the case settled."

¶ 69 On cross-examination, when asked if the insurance companies had already denied coverage when he was hired in May 2010, Rosenthal responded that the insurance companies

24

had stated their position that only one policy applied, but part of his role was to analyze the policies and engage with the carrier to see if they would contribute more. When asked the question again, Rosenthal answered that the insurance companies had not denied coverage. Rosenthal admitted that in a deposition he had stated that the insurance companies had denied coverage. Rosenthal testified that he worked to develop good faith arguments as to why the insurance company should provide coverage under the policies.

¶ 70 Kent Ray testified that he was employed by the County in the State's Attorney's office as the chief of the civil actions bureau. Ray was not involved in the Young Lawsuit, or in the insurance purchase for the 2007 policy period. Ray executed the settlement of the AIG Lawsuit on behalf of the County. Of the $52 million settlement, the County received $10.8 million.

¶ 71 Ray broke the settlement into two parts, the False Claims Act portion, and the remaining portion. In the settlement, $26 million was allocated to the False Claims Act portion. Under the False Claims Act, an award is subject to treble damages. The first level was the recovery, and the double and treble damages were punitive. In the settlement, each level was allocated $8.66 million. Of the first recovery level, the State of Illinois received one-third of the funds, which left $5.77 million. Of this remainder, the County received 25% as directed in the Young settlement, which was $1.45 million.

¶ 72 As to the remaining $26 million in the settlement, there were three allocations: (1) $6 million for the interest on the $20 million of coverage the County did not receive; (2) $6 million in consequential and incidental damages relating to the costs the County spent by not having insurance coverage; and (3) $14 million of value for the County waiving its right to appeal regarding punitive damages. The allocation of these funds was also subject to the 75%-25% apportionment in the Young settlement.

25

¶ 73    On cross-examination, when asked if the name of the insurance company did not make a difference, then the County had no case against USI, Ray responded as follows.

> "It's tough for me to answer that because the name of the insurance company did have a difference in terms of coverage. Because of the name of the insurance company, the County was denied coverage for the Young cases."

¶ 74    Ray agreed that the Young plaintiffs had originally made a settlement demand of $80 million, but eventually settled for $55 million and the assignment of rights. He also conceded that while the Young plaintiffs took the position in the AIG Lawsuit that there was coverage under the 2007 policy period policies, the County maintained that there was no coverage at that time. One of the provisions of the AIG settlement provided that $36.8 million would be received by the County.

¶ 75    Ray testified that in 2010, when the Young Lawsuit was settled, the County did not know what the value of the assignment of rights would be until litigation against the insurance companies was resolved. Ray stated that he believed the County proved that the switch in insurance companies mattered.

¶ 76    Following Ray's testimony, the County rested its case.

¶ 77    USI presented two expert witnesses in its case. James Figliulo testified that he was a trial lawyer and was presented as an expert on damages. Figliulo stated that he:

> "was asked to look at the case and focus my attention on the damage claim and whether the claim by Cook County in this action resulted in any damages or the action by USI resulted in any damages to Cook County based on the allegations."

¶ 78    In Figliulo's opinion, the County did not suffer any economic damage or any substantial damage by anything USI did or did not do. According to Figliulo, the attorneys for the Young

plaintiffs recognized that the insurance policies that USI had obtained for the County had value and they believed that the insurance companies had wrongfully denied coverage. The Young plaintiffs agreed to take the assignment of rights, and as a result, the County was "released." The County was "done. They got the protection that they wanted. They got a full release of any claims by the class action plaintiffs." Figliulo further stated,

> "From that moment on, Cook County had no exposure to any claims by the class action plaintiffs, and they had used the rights under those policies that USI obtained to give them the protection that they had bargained for."

¶ 79    Figliulo testified that if the insurance policies procured by USI did not obligate coverage, then there would not have been a settlement on those terms. According to Figliulo, the settlement of the AIG Lawsuit confirmed his belief that the insurance companies had been the wrongdoer. He noted that the trial judge's ruling on the posttrial motions in the AIG Lawsuit found the insurance companies, which included both Illinois National and ICSOP, breached their contract to the County to provide coverage. He believed the County received additional value in the subsequent settlement of the AIG Lawsuit.

¶ 80    He opined that the settlement should have no impact in the case against USI because USI was not a party to the agreement. He also reasoned that the settlement allocations have no impact on the claims against USI. Figliulo specifically noted the $14 million allocated to waiving an appeal on punitive damages to be questionable because the trial court in the AIG Lawsuit reversed a jury finding of punitive damages and found the evidence was not sufficient for an award of punitive damages. In his opinion, this allocation by the Young plaintiffs and the County was to avoid setoffs in the case against USI. He also did not believe that the County suffered any consequential damages as allocated in that settlement because the County got what it bargained

for, a release from the Young Lawsuit.

¶ 81    On cross-examination, Figliulo admitted that sometimes allocations in a settlement take place between parties when done in good faith that impacts insurance, but the insurance company is not a party to the settlement. He maintained that in the AIG settlement, the County received the protection of the coverage via the assignment as well as a monetary recovery from the bad acts of the insurance companies. When discussing whether it was reasonably foreseeable that USI would breach the parties' contract, Figliulo stated:

> "My premise is when two parties enter into a contract, it's reasonably foreseeable that one or the other is going to breach the contract and that there's damages, but it's not reasonably foreseeable that a third party is going to wrongfully or illegally do something to cause damage."

¶ 82    Figliulo opined that it was reasonably foreseeable that the insurance companies would breach their contract with the County, but not that the insurance companies' breach would impact the contract between the County and USI.

¶ 83    Christopher McClure testified that he was a forensic accountant and an expert on damages. His opinions were (1) the County's claim for damages is not accurate; and (2) the damage calculation relates to a new wrongful act that occurred in 2007. The new wrongful act that occurred in 2007 was the failure to use the privacy screens for strip searches in the jail. McClure opined that the County should deduct its $10 million deductible for the 2007 wrongful acts, and then consider the value of the assignment was $25 million, when the AIG cash settlement of $55 million was deducted from the Young plaintiffs' settlement demand of $80 million as well as the award the County received from the AIG settlement. Based on this, he concluded that the County has no damages in the case. According to McClure, the total amount

of the County's settlement payment in the Young Lawsuit that is attributable to the new wrongful acts in 2007, as alleged by the County, is less than the $10 million SIR under the 2007 policy. McClure based this conclusion on his analysis of the number of claimants in the Young Lawsuit with the wrongful acts that occurred under the 2007 policy. He further reasoned that the County could have avoided these damages by changing its conduct sooner.

¶ 84    After the conclusion of McClure's testimony, USI rested its case. The County did not present any rebuttal evidence. Following closing arguments and deliberations, the jury entered a verdict in favor of the County.

¶ 85    As part of the verdict, the jury answered 17 special interrogatories. In the interrogatories, the jury found that the County proved that USI breached the contract and the County failed to perform all its obligations under the contract, but the County proved it had a valid excuse for its failure to perform. The jury also found that USI did not prove that the County filed its complaint more than two years after the County's claim for insurance was denied by ICSOP. The jury further found that the County proved that it had sustained damages by USI's breach of contract. The jury entered an award of $20 million in direct damages and $500,000 in consequential damages. However, the jury also found that the County could have avoided $10 million in damages if it had exercised reasonable effort and ordinary care. The jury then found that the County had already recovered $1.45 million in the damages it was claiming. After subtracting the setoff and mitigation from the damages, the jury entered an award of $9.05 million. The trial court entered a judgment on the jury's verdict on March 30, 2018.

¶ 86    Both parties filed posttrial motions. USI's pottrial motion sought a JNOV on the breach of contract claim for several reasons: (1) the County presented no evidence that Illinois National would have provided coverage under the 2007 policy period, and therefore, there was no

evidence of a material breach or damages; (2) the County presented no evidence that it suffered a loss greater than its $10 million deductible; (3) the claim is time-barred; and (4) the County approved the ICSOP policy, which defeats its claim. In the alternative, USI also asked the trial court to modify the damages award reflect the undisputed evidence that USI is entitled to a setoff of $36.8 million, or at least $10.8 million, which reduces the award to zero. The County's posttrial motion also sought a JNOV on USI's mitigation affirmative defense and an award of the full $20 million in direct damages. The County also asked the trial court to enter an order awarding it the full $32.5 million in claimed consequential damages. In the alternative, the County asked for a new trial on the consequential damages only. In August 2018, the trial court denied both parties' posttrial motions and disposed of breach of contract claim in its entirety.

¶ 87    Regarding the breach of fiduciary claim, the trial court conducted a bench trial in May 2018. The bench trial consisted of three witnesses, Jeff Ludwig, Ralph Wilson and Timothy Walsh, all of whom testified in the jury trial.

¶ 88    Ludwig stood by and adopted his previous testimony from the jury trial. He testified that he was aware of an invoice for the first level excess liability insurance premium issued by USI to Cook County in December 2006, for $1,434,313, which included $174,986.19 for USI's commission. Cook County paid this premium to USI, and USI then forwarded the payment to Tri-City Brokerage, a wholesale brokerage company. Tri-City acted as an intermediary between USI and the insurance companies and was an authorized agent for AIG. Tri-City submitted the payment to AIG. The premium was to pay for the insurance policy required under the contract. Ludwig disagreed that the contact required Illinois National as the carrier, and maintained that the contract required an A+ VII rated company.

¶ 89    The invoice noted that it was for a renewal. ICSOP had provided excess liability

coverage in the 2006 policy period. While the binder was issued for Illinois National, the policy issued in May 2007 was for ICSOP. The policy was first transmitted to the County on June 27, 2007. In the intervening time from the issuance in May to the transmittal in June, USI made modifications to the policy language. The modifications were made by USI in its role as the County's fiduciary and were discovered during USI's review process of the policy. This review process was part of the services provided as a broker. USI did not request a change in the name of the insurance carrier.

¶ 90    Ludwig believed that USI did all the steps in its power to obtain the County's insurance coverage by reporting claims and doing what was required as their broker. If the County wanted the name of the insurance carrier to be changed, then it was the County's responsibility to review the contract and request changes. Ludwig did not believe the name change mattered, but he did not tell the County his opinion. He could not speak to communication from other USI employees. USI was "hired to help them design and deliver an insurance program that, you know, that met the qualifications of their contract." When asked what other steps the County could have taken to mitigate, Ludwig responded that the County has a large staff of insurance professionals as well as other resources, such as engaging other professionals to examine the policy and the question of whether the name of insured mattered for coverage. Ludwig maintained that USI provided the services listed in the contract, which included actuarial analysis, providing loss control, and risk mitigation advice, as well as clarifications about coverage. When asked if there was a step that USI could have taken when it was clear that the insurance companies were not going to pay, Ludwig answered, "at that point it was really the insurance company's obligation and accountability." There was nothing to his knowledge that USI could have done.

¶ 91    Ludwig recognized a confirmation letter from Tri-City Brokerage to USI, dated December 27, 2006, which confirmed insurance coverage with Illinois National for the 2007 policy period and detailed the amount of $1.4 million as the premium. The County paid the premium to USI, who then paid it to Tri-City. USI subsequently received a confirmation that Tri-City received the payment and forwarded the payment for the Illinois National policy. USI received a commission from this premium. Illinois National never refused claims or canceled the policy for failure to pay the premium. When the policy issued from ICSOP in May 2007, USI did not receive any additional commission or benefit. USI made new claims to Illinois National for the Young Lawsuit, and these claims were not denied for lack of payment nor for any reason that the policy was invalid or ineffective.

¶ 92    Ludwig acknowledged that USI had an obligation to send the County's payment to Illinois National. When asked why USI did not do anything when the policy issued from ICSOP, he answered that USI's conclusion was that the change in name was "immaterial" and the coverage was in force. He agreed that while USI tried to pay Illinois National, but disputed that ICSOP received the premium. He maintained that the premium was submitted to Tri-City in accordance with the contract.

¶ 93    Wilson stood by his previous testimony at the jury trial. It was Wilson's opinion that the 2007 policy period policies applied due to multiple occurrences. He maintained that he told the County that the 2007 policy period limits would only apply if the County was able to establish a second wrongful act occurred in the policy year. He believed USI took every step to try to get the $20 million in coverage to mitigate the County's damage. Wilson denied that he received any improper commissions or payments from anyone in connection with his work for the County. In his ten years of representing the County, Wilson denied that he ever acted in any way to

intentionally harm or mislead the County. He testified that he did his "very best" to maximize the benefits of the insurance policy and deliver innovative ideas. He does not believe that the name of the insurance company made a difference for coverage. He believed that the change from Illinois National to ICSOP had no effect on coverage for the County. According to Wilson, the insurer was AIG, the issuing company was ICSOP for the policy and Illinois National for the binder. Ultimately, any issue would be with AIG, who owned both companies. According to Wilson, any claims would be directed to AIG because both the underwriters and claims departments were employees of AIG.

¶ 94    The County rested after Wilson's testimony. USI moved for a directed finding, but the trial court reserved ruling until all the evidence was admitted since it was a bench trial.

¶ 95    Walsh testified that the County submitted some claims to Illinois National under the binder and Illinois National provided coverage under a reservation of rights. Illinois National did not deny coverage for nonpayment of the premium nor did Illinois National send any notice of cancellation. Walsh admitted to receiving an email from USI which explained how the insurance would work for the class action in which one wrongful act occurs over more than one policy period. It stated that it would be deemed as one continuous act and only the insurance policy in effect when the initial wrongful act was reported would apply. USI rested after Walsh's testimony.

¶ 96    On August 24, 2018, the trial court entered a written opinion on the breach of fiduciary duty count and found in favor of USI. In its decision, the court observed that "[n]o expert witness testified at the jury or bench trial that the ICSOP policy had materially different provisions from the Illinois National policy which caused the insurance companies to deny coverage or to explain the reasons Illinois National denied coverage." The court then discussed the Insurance Placement

33

Liability Act (735 ILCS 5/2-2201(b) (West 2010)) as it related to the allegations against USI.

The court then concluded as follows.

> "USI paid the premium for the insurance it procured to Illinois National, the
> carrier providing the insurance. USI did so by paying the premium to the
> wholesale broker, Tri-City, who in turn paid Illinois National. There was no
> evidence that an additional premium was paid to ICSOP, or was/paid because of
> the change in carriers, or that USI benefited monetarily from the change. There
> was no evidence that USI misappropriated or retained any money that was
> received as premiums, as a premium deposit, or as payment of a claim. The Court
> finds USI did not wrongfully retain or misappropriate any money that was
> received as premiums, as a premium deposit, or as a payment of a claim."

¶ 97   All parties have appealed. USI filed its notice of appeal on August 30, 2018. The County filed its notice of cross-appeal on September 7, 2018, which was subsequently amended on September 21, 2018. All notices of appeal were filed in compliance with Illinois Supreme Court Rule 303 (eff. Jan. 1, 2015). Accordingly, this court has jurisdiction of this consolidated appeal under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 98   We first consider USI's arguments raised on appeal. USI argues that the trial court erred in denying its motion for JNOV for several reasons: (1) the County's action was barred by the statute of limitations; (2) the County's excess insurance policy provided coverage and there was no evidence that a different insurance carrier would have responded differently; (3) there was no evidence that USI breached its contract with the County; and (4) the County's monetary judgment should be offset by the County's recovery from the insurance companies.

¶ 99   A JNOV is " 'properly entered in those limited cases where "all of the evidence, when

viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." ' " *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 33 (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992), quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). In making this determination, the trial court must be mindful of the role of the jury as factfinder, and must not reweigh the evidence, reevaluate the credibility of the witnesses or set aside a verdict merely because a contrary result is reasonable. *Maple*, 151 Ill. 2d at 452. "Likewise, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Id*. at 452-53.

¶ 100　"[A] judgment n.o.v. may not be granted merely because a verdict is against the manifest weight of the evidence." *Id*. at 453. "In other words, a motion for judgment n.o.v. presents 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942)). A "judgment n.o.v. is inappropriate if 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " *Id*. (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995)). We review a trial court's decision on a motion for JNOV *de novo*. *Id*.

¶ 101　USI first contends that the trial court erred in denying its motion for JNOV because the County's action is time barred. Specifically, USI asserts that the action was untimely because it was filed more than two years after the County received its policy; or in the alternative, it was

filed more than two years after the County discovered the breach, *e.g.*, when the insurance company denied coverage. The County maintains that its action was timely filed.

¶ 102    Section 13-214.4 of the Code of Civil Procedure provides:

> "Actions against insurance producers, limited insurance representatives, and registered firms. All causes of action brought by any person or entity under any statute or any legal or equitable theory against an insurance producer, registered firm, or limited insurance representative concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance shall be brought within 2 years of the date the cause of action accrues." 735 ILCS 5/13-214.4 (West 2010).

¶ 103    The Illinois Supreme Court in *American Family Mutual Insurance Co. v. Krop*, 2018 IL 122556, considered the question of when a cause of action accrues against an insurance company under section 13-214.4. This opinion was issued after the proceedings had concluded in the trial court. In *Krop*, the insureds alleged that an agent of their insurance company had promised to sell them a policy "equal to or better than" their previous policy. *Id.* ¶ 4. After purchasing the policy from the insurer, and renewing for the following three years, the insured were sued in an unrelated action for defamation, invasion of privacy, and intentional infliction of emotional distress; the insurer subsequently denied coverage and sought a declaratory judgment to support its denial of coverage. *Id.* ¶¶ 4-6. The insureds countersued, and brought a third-party complaint against the insurer's agent for "negligently fail[ing] to provide them with an insurance policy equal to [the prior policy], as they had requested." *Id.* ¶ 8. Both policies provided coverage for injuries caused by "occurrences," but the policy with the prior insurer included "personal injury" in its definition of "occurrence," and the new policy did not include that coverage in the

36

definition. *Id*. The insureds argued that the insurance agent failed to exercise ordinary care and as a result, they lacked coverage for personal liability in the unrelated lawsuit. *Id*. The insurer and its agent filed a motion to dismiss the insureds' counterclaims, asserting that the claims were time barred under the statute of limitations. The trial court granted the motion and dismissed the counterclaims as untimely, finding that the two-year limitation to file claims began to accrue when the policy was issued. *Id*. ¶ 10. The appellate court reversed, finding that the "discovery rule" delayed the start of the limitations period until the insureds knew or should have known of the injury. *Id*. ¶ 11.

¶ 104    Before the supreme court, the insureds argued the discovery rule should apply, which "delays the start of the limitations period until the claimant knew or reasonably should have known of the injury and that the injury was wrongfully caused." *Id*. ¶ 21. "When a complainant should have discovered an injury is a question of fact, but this court can determine when the limitations period began if the facts are undisputed and only one answer is reasonable." *Id*.

¶ 105    However, the supreme court rejected the insureds' discovery rule argument, and found that the insureds' obligation to read its policy controls. *Id*. ¶ 29.

> "Customers generally know their own goals better than their insurance agent does, but determining if a policy achieves those goals will be difficult when customers do not read the policy. Expecting customers to read their policies and understand the terms incentivizes them to act in good faith to purchase the policy they actually want, rather than to delay raising an issue until after the insurer has already denied coverage. *** Moreover, insurance customers frequently maintain the same insurance policy for years, perhaps decades, at a time. If the cause of action did not accrue until the insurance producer notified the customer of an

uninsured liability, insurance customers would benefit from their policy throughout the intervening period, while evidence potentially relevant to the insurer's defense would be at risk of deterioration. Therefore, because insurance customers can read their policies and learn of any defects, the discovery rule *typically* will not delay the start of the two-year limitations period for negligent failure to procure insurance." (Emphasis added.) *Id.*

¶ 106    "Because Illinois treats negligent failure to procure insurance as a tort arising out of a contract, 'the cause of action ordinarily accrues at the time of the breach of contract, not when a party sustains damages.' " *Id.* ¶ 35 (quoting *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77 (1995)). "Although the discovery rule delays the start of the limitations period until the plaintiff should discover the *injury*, we find that insurance customers are injured as soon as an insurance producer delivers a policy that does not conform to the customers' request." (Emphasis in original.) *Id.*

¶ 107    Nevertheless, the *Krop* court recognized exceptions to this rule where a "policyholder reasonably could not be expected to learn the extent of coverage simply by reading the policy." *Id.* ¶ 36. "In some cases the insurance policies may contain contradictory provisions or fail to define key terms. In others the circumstances that give rise to the liability may be so unexpected that the typical customer should not be expected to anticipate how the policy applies." *Id.* As an example, the supreme court noted a decision from the Indiana Supreme Court, *Groce v. American Family Mutual Insurance Co.*, 3 N.E.3d 1154 (Ind. 2014). In that case, the insureds sued their insurer and its agent due to a lack of coverage in a homeowners' policy. The Indiana Supreme Court recognized that while the " 'reasonable reliance upon an agent's representations can override an insured's duty to read the policy,' " the exception did not apply in that case

where the agent's promise to write up a policy request was a "promise of future activity, and did not constitute any representation about existing provisions related to coverages or limits in the homeowners policy." *Id*. at 1159 (quoting *Filip v. Block*, 879 N.E.2d 1076, 1084 (Ind. 2008)). We interpret the Illinois Supreme Court's citation in *Krop* to the *Groce* language " 'reasonable reliance upon an agent's representations can override an insured's duty to read the policy' " as an example of a circumstance that could fall within the discovery rule. *Krop*, 2018 IL 122556, ¶ 36.

¶ 108   The *Krop* court concluded that an exception did not apply in the case before it where the insureds would have discovered the breach upon receipt of the deficient policy if they had read the policy. Specifically, the supreme court observed that the "difference between the two policies was apparent" because the definitions section of the new policy expressly excluded any injury that did not result in actual bodily harm to the person and the prior policy included personal injury. *Id*. ¶ 37. Since the insureds did not plead facts showing that they could not have read the policy and understood its terms, the court reversed the appellate court and affirmed the trial court's dismissal of the counterclaims. *Id*. ¶ 38.

¶ 109   In a motion to cite supplemental authority, the County asked this Court to consider the recent federal district court decision in *Pape v. Braaten*, 2019 WL 4750036, and USI responded that *Pape* was distinguishable and that the decision in *Austin Highlands Development Co. v. Midwest Insurance Agency, Inc.*, 2020 IL App (1st) 191125, was more applicable.

¶ 110   In *Pape*, the plaintiffs sued multiple defendants for negligence, breach of fiduciary duty, fraudulent misrepresentation, and unjust enrichment arising from the defendants' involvement in advising and procuring life insurance policies for the plaintiffs. In a motion to dismiss, the defendants argued that the plaintiffs' cause of action was time barred because it was filed more than two years after the life insurance policies were issued. The district court, applying Illinois

law, discussed *Krop* and how it applied in that case. The defendants asserted that under *Krop*, all claims in the plaintiffs' action were barred because the complaint was filed more than two years after the policy was issued. The district court disagreed and found that reasoning "extends *Krop* well beyond its intended reach." *Id*. at 9. "*Krop* did not hold that all claims to which Section 13-214.4 applies will necessarily accrue as soon as the claimants receive the insurance policy. If the parties dispute that a claimant's injury would have been reasonably apparent from the text of an insurance policy, or dispute other facts relevant to determining when the claimant 'should have discovered an injury,' it is the province of the jury to resolve that dispute." *Id*. (quoting *Krop*, 2018 IL 122556, ¶ 21). The district court concluded that the plaintiffs "have alleged a basis for dispute as to whether any of their claims would have been reasonably apparent from the text of the two life insurance policies" and, accordingly, held that the defendants failed to establish that the plaintiffs' complaint demonstrated that the claims were time barred. *Id*.

¶ 111   In *Austin Highlands*, 2020 IL App (1st) 191125, the plaintiff acted as an agent for entities that own various apartment complexes in the Chicagoland area. The defendant acted as the plaintiff's agent to procure insurance for the apartment complexes and business conducted by the plaintiff and the entities. *Id*. ¶ 3. The policy issued in November 2015. In March 2016, the plaintiff was sued in a federal class action lawsuit for violating Illinois statutes related to security deposits. The plaintiff sought coverage under the policy, but the insurer denied coverage. The plaintiff sued the defendant in October 2018 for breaching its duty of ordinary care in procuring insurance for the plaintiff. *Id*. ¶¶ 4-5. The defendant filed a motion to dismiss alleging that the cause of action was time barred. The trial court granted the motion to dismiss. *Id*. ¶¶ 6-7.

¶ 112   On appeal, the reviewing court considered *Krop* as it applied to the defendant's claim that the action was filed outside of the statute of limitations. The court found that since the plaintiff

filed its cause of action nearly three years after it received its insurance policy and "it has not pled any facts showing it reasonably could not have been expected to learn the extent of coverage simply by reading the policy," the action was filed outside the statute of limitations. *Id.* ¶ 19. The court observed that there was "no genuine issue of fact as to when [the plaintiff] knew or should have known of the alleged deficiency in its policy," and accordingly, the action was time barred. *Id.* ¶ 22.

¶ 113   We find *Austin Highlands* to be distinguishable from the instant case on its facts. Here, USI contends that the County's cause of action accrued in June 2007 when the ICSOP policy was delivered because the onus was on the County to read and approve the policy, and Walik, as the director of risk management, did so. The County asserts that this case falls within *Krop*'s exception because Walik testified at trial that she asked if the change in insurance companies impacted the County's coverage and was told by USI employee McIntosh that the change did not matter. Additionally, Wilson testified that he did not notify the County of the change upon receipt of the policy, but noted the change in the issuing company when the policy was submitted to the County on or about June 26, 2007. When asked why USI waited until the end of June to notify the County of the change in carrier, Wilson responded, "The name made no difference." Based on these facts, we reject USI's reading of *Krop* and instead conclude that the facts of this case fall within the exception. The supreme court's list in *Krop* was not exhaustive, but rather offered examples in which the exception could apply. Here, it is uncontested that the County did, in fact, read the policy and immediately sought guidance from its broker, USI. These facts are similar to the language from *Groce* that the supreme court cited in *Krop*, *i.e.*, " 'reasonable reliance upon an agent's representations can override an insured's duty to read the policy.' " *Krop*, 2018 IL 122556, ¶ 36 (quoting *Groce*, 3 N.E.3d at 1159, quoting *Filip*, 879 N.E.2d at

41

1084). In contrast, the policy language at issue here remained the same after the change in carrier whereas in *Krop*, the language in the new policy changed as did the coverage. Unlike the facts in *Krop* and *Austin Highlands*, we find this case falls within the circumstances envisioned by *Krop* in which "the policyholder reasonably could not be expected to learn the extent of coverage simply by reading the policy." Accordingly, we hold that the discovery rule is applicable in this case and the limitations period did not start until the insurer denied coverage.

¶ 114   USI alternatively argues that under the discovery rule, the County's cause of action is still time barred because the County was aware that the insurer denied coverage more than two years before the complaint was filed on July 19, 2012. USI points to a February 20, 2008 letter from AIG to Walsh and Walsh's testimony regarding the letter. We reject this argument for two reasons. First, the cited testimony contains no admission from Walsh because several objections to this testimony from the County were sustained. Second, the letter stated that the purpose was to advise the County of ICSOP's coverage position as to the Young Lawsuit and a reservation of rights.

> "This letter also serves to reserve ICSOP's rights including, but not limited to, the *right to decline coverage* and to seek declaratory relief at a later time based on the terms, exclusions, conditions, and definitions within the captioned policies, underlying insurance, and/or applicable 1aw." (Emphasis added.)

¶ 115   The letter explicitly did not deny coverage and cannot be used to support such a claim on appeal. USI also cites and relies upon Niedbalski's testimony that the insurer denied coverage for a new occurrence in March 2010. However, his testimony did not refer to coverage denial, but rather discussed the argument that a new wrongful act occurred in the 2007 policy period as a reason to claim coverage. Niedbalski testified that AIG "denied that a new occurrence took place

in '07." No testimony explicitly discussed the date of a complete denial by ICSOP or AIG for coverage of the Young Lawsuit. USI refers to testimony from Rosenthal as corroboration of the denial. However, Rosenthal testified that when he was hired in May 2010, ICSOP had not denied coverage and had agreed to provide coverage under one policy and a question existed as to the other policy. USI further points to an email, dated July 20, 2010, from Rosenthal forwarding a letter from ICSOP to Catania. In his forwarding email, Rosenthal referred to the denial of coverage, but the letter from ICSOP's attorneys, also dated July 20, 2010, stated that "ICSOP continues to reserve all of its rights, including but not limited to its right to decline coverage ***."

¶ 116    The record is clear that ICSOP continued to reserve its right to deny coverage less than two years before the County filed this action on July 19, 2012. The letter from July 20, 2010, indicating such reservation of rights was written within the two-year limitations period. Further, Rosenthal testified that the discussions regarding insurance coverage continued into August 2010. Additionally, we note that this evidence was presented to the jury, and the jury specifically found in a verdict interrogatory that USI failed to prove that the County did not file its action within two years of the date that ICSOP denied coverage. Based on the evidence presented at trial, the jury considered this issue and found against USI. A court "has no right to enter a [JNOV], if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454. Under this standard, we find that the trial court properly denied USI's motion for a JNOV on this issue.

¶ 117    Next, we consider USI's arguments related to the County's breach of contract claim. In

order to prevail on a claim for breach of contract, a plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resultant injury to the plaintiff. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 85. "Whether a contract exists, its terms, and the parties' intent are questions of fact to be determined by the trier of fact." *Id*. ¶ 81. In Illinois, a contract to procure insurance is established when (1) one of the parties seeks to be insured and the other party agrees to obtain insurance for him; (2) the subject, period, amount and rate of insurance are ascertained or understood by both parties; and (3) the premium is paid. *Zannini v. Reliance Insurance Co. of Illinois, Inc.*, 147 Ill. 2d 437, 454 (1992).

¶ 118    Here, USI was the insurance broker for the County to procure excess liability coverage from an insurance company.

> " 'A broker is an individual who procures insurance and acts as a middleman between the insured and the insurer, who solicits insurance business from the public under no employment from any special company and who, having secured an order, places the insurance with the company selected by the insured, or in the absence of any selection by the insured, with a company he selects himself.' "
>
> *Zannini*, 147 Ill. 2d at 451 (quoting *Krause v. Pekin Life Insurance*, 194 Ill. App. 3d 798, 804-05 (1990)).

¶ 119    USI first contends that it was entitled to a JNOV because the ICSOP policy provided coverage and there was no evidence that Illinois National would have responded differently. The County responds that it had no obligation to prove the argument advanced by USI. The County also points out that USI's argument was not included as one of the elements the County had to prove in the instructions given to the jury.

¶ 120    At trial, the jury received the following breach of contract instructions.

"Cook County claims USI breached a Contract between them.

The terms of the contract required USI to perform all of the following services:

•obtain the insurance policy described on Attachment B to the parties'

contract.

• 'review all policies received from carriers immediately upon their receipt

and shall verify that the terms of the policies conform to the provisions of this

Contract.'

• 'at all times to act in the County's best interest.'

• not 'unilaterally reduce, alter or modify the terms of the Coverages

placed on behalf of the County without the prior written approval of the County.'

• 'recommend the placement of coverage with excess liability carriers

willing to issue policies consistent with the terms of this Contract which policies

are designed to suit the specific and unique needs of the County.'

• 'On a continuing basis, Contractor shall review binders, policies and

endorsements to verify compliance with the County's specifications and shall

request modifications as necessary and as approved by the Director subject to the

terms of this Contract.'

The County has the burden of proving USI breached the contract in at least one of

the following way(s):

• Failing to obtain a policy consistent with the description set forth on

Attachment B to the Contract; or

• Failing to review all policies received from carriers immediately upon

their receipt and verify that the terms of the policies conformed to the provisions of the Contract; or

> • Failing to at all times to act in the County's best interest; or

> • Unilaterally reducing, altering or modifying the terms of the Coverages placed on behalf of the County without the prior written approval of the County; or

> • Not recommending the placement of coverage with excess liability carriers willing to issue policies consistent with the terms of this Contract which policies are designed to suit the specific and unique needs of the County; or

> • Failing to, on a continuing basis, review binders, policies and endorsements to verify compliance with the County's specifications and request modifications as necessary and as approved by the Director subject to the terms of this Contract."

¶ 121   In a verdict interrogatory, the jury found that the County had proven that USI "breached the contract by its failure to perform its obligations under the contract." USI has not challenged the jury instructions on the breach of contract claim. Rather, USI contends that the breach of contract instructions all relate back to whether ICSOP provided coverage and whether Illinois National would have responded differently.

¶ 122   At trial, the USI employees, including Wilson and Niedbalski, maintained that the change in the name of the carrier from ICSOP to Illinois National did not affect the coverage. Wilson testified that he advocated to the insurer that the Young Lawsuit was covered under the 2007 policy period if the County could establish that a new wrongful act occurred, which was the subject of the AIG Lawsuit.

¶ 123   The County asserted at trial that section 3F of the insurance policy changed the coverage. Section 3F provided:

> "All occurrences arising out of continuous, repeated, or related occurrences shall
> be treated as one occurrence. All wrongful acts or employee benefit wrongful acts
> arising out of continuous, repeated, or related wrongful acts or employee benefit
> wrongful acts shall be treated as one wrongful act or one employee benefit
> wrongful act. The Limits of Insurance in effect when the first claim or suit is
> made and reported to us shall apply."

¶ 124   The County's position at trial was presented primarily through the testimony of Catania and Valiulis. Both witnesses were attorneys; Catania was an ASA for the County while Valiulis was an outside attorney retained to investigate the contract with USI, but has since retired.

¶ 125   However, before we consider the impact of their testimony, we must address a contention by USI that the subject testimony was improper. Within its argument, USI asserts that the testimony of Catania and Valiulis about the contract was inadmissible legal opinion. During the trial, USI objected to Catania's testimony as "undisclosed opinion and mischaracterize[d] the policy" and the trial court overruled the objection. Later, USI objected twice to Valiulis's testimony. First, USI objected that Valiulis was "interpreting the contract to the jury," which the court overruled. Shortly thereafter, USI objected as to "foundation and improper opinion testimony" regarding whether the County was made whole, which the court sustained.

¶ 126   While USI briefly argues that the testimony was improper, it fails to fully discuss the objections made in the trial court as well as our standard of review of the trial court's ruling. " 'It is a fundamental rule of law in Illinois that a party desiring to preserve a question for review must make appropriate objection in the court below, and that a failure to object to preserve a

47

question for review constitutes a waiver.' " *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 131 (quoting *Brown v. Timpte Inc.*, 137 Ill. App. 3d 1053, 1062-63 (1985)). Objections must be sufficiently specific as to the grounds of the objection, and a general objection will not preserve the issue on appeal. *Id*. Here, USI made some objections to Catania's and Valiulis's testimony as undisclosed or improper opinion testimony, but did not specifically object to their respective testimony as improper legal opinion. Thus, this argument was not preserved on appeal.

¶ 127   Even if the objections were appropriately specific, " 'the admissibility of evidence is a matter for the sound discretion of the trial court, and its decision will not be reversed on appeal unless that discretion has been clearly abused.' " *Id*. ¶ 133 (quoting *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995)). USI offers no argument regarding the trial court's discretion in overruling its objection. Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). USI raises this claim of inadmissible testimony in one paragraph without a discussion of the preservation of the issue in the trial court, nor the standard of review. USI further offers a general conclusory citation that legal opinion testimony is inadmissible without a reasoned analysis to explain how the trial court abused its discretion in overruling its objection. Additionally, while this assertion was mentioned in USI's JNOV motion, USI did not raise this as an error to be corrected by the trial court nor as

a separate basis for JNOV. We find this argument insufficient under Rule 341(h)(7), and accordingly, it has been forfeited on appeal.

¶ 128    Returning to the substance of the subject trial testimony, Catania focused on the last sentence in section 3F. According to Catania, the term "us" in this section was relevant to the switch in carriers from Illinois National to ICSOP. Catania explained:

"If the insurance company is Illinois National, that's not the same 'us' as ICSOP. If you place ICSOP over Illinois National, the insurance company that was first notified of the claim or suit and reported to ICSOP would have been the same insurance company under 2006. So it made a difference to have it under 2007."

¶ 129    Similarly, Valiulis summarized the County's position such that under an Illinois National policy in the 2007 policy period, there would have been coverage, but with the ICSOP policy, there was no coverage. Valiulis explained that this position was based on section 3F of the insurance policy.

"Well, the significance is that last sentence, it says 'The limits of insurance shall apply on the policy in effect when the first claim or suit is made and reported to us.'

'Us' is the key. If Illinois National is the carrier, 'us' refers to Illinois National. Illinois National did not have a policy with Cook County in 2006.

So the first time any of the claims were reported or the lawsuit was reported to Illinois National, the only policy in effect would have been the 2007 policy. So there would have been coverage if Illinois National was the carrier for claims that were made -- wrongful acts that took place in 2007.

But if ICSOP is the carrier, ICSOP was also the carrier in 2006 on a

49

smaller policy. So that language would say the limits of insurance, when the first claim or suit was reported to 'us,' the 'us' being ICSOP, that would have been reported -- would go back to 2006. That's when the first – that's when this lawsuit was reported to ICSOP and the 2006 claims were reported to ICSOP.

So the $5 million limit of the 2006 policy would preclude any coverage under the 2007 policy, if ICSOP is the carrier. If Illinois National is the carrier, there would be additional coverage. That's what USI never told Cook County, the significance of that."

¶ 130   In contrast, USI's witnesses testified that insurance coverage was denied by ICSOP because the strip searches were part of a continuous, repeated, or related occurrences and constituted one occurrence. The jury was presented with these opposing positions on the interpretation of section 3F as it related to the coverage. It was within the province of the jury to read the contract language in tandem with the testimony at trial.

¶ 131   Nevertheless, USI maintains that the County cannot establish a breach of contract because ICSOP was ultimately required to provide coverage in the AIG Lawsuit. USI relies on *Industrial Enclosure Corp. v. Glenview Insurance Agency, Inc.*, 379 Ill. App. 3d 434, 435 (2008), in support.

¶ 132   In that case, the plaintiff manufactured industrial boxes. The defendant was an insurance agency, but acted as the plaintiff's insurance broker by procuring insurance from outside insurance agencies. The parties had worked together for multiple years with the defendant having procured coverage for property insurance from an insurance carrier. The parties discussed adding flood insurance to the plaintiff's policy, but concluded not to include that coverage. At one point, the parties decided to shop around for competitively priced coverage, and ultimately, the plaintiff

decided to obtain property insurance from a new carrier. The new policy did not cover flood damage, but did include coverage for water damage due to sewer backup. The plaintiff believed the new policy provided the same or better coverage to its prior policy. Subsequently, the area near the plaintiff's warehouse experienced rainfall close to 17 inches. The plaintiff's warehouse flooded and it sought coverage. The property insurer's adjuster inspected the damage and rejected the claim, finding that the damage was due to flooding. The insurer maintained the denial after the plaintiff challenged the adjuster's finding. The plaintiff sued the insurance company in federal court and the jury found in favor of the plaintiff, awarding $1.1 million in damages. *Id*. at 435-36.

¶ 133    The plaintiff then sued the defendant to recover attorney fees, costs, and additional lost profits not recovered in the federal action. The plaintiff alleged that the defendant breached its duty to procure an insurance contract consistent with its wishes and that the defendant was negligent as to the insurance policy it did procure. Following a trial, the jury found in favor of the plaintiff and awarded over $500,000. The defendant moved for a JNOV, which the trial court granted. The court held that the proximate cause of the plaintiff's damages was the insurance company's wrongful denial, not any act by the defendant, and the defendant did not a owe a duty to the plaintiff to explain that the insurance company might determine that flooding caused by surface water would or could nullify the sewer drain coverage. *Id*. at 436-37.

¶ 134    On appeal, the plaintiff argued that the defendant's sale of the new insurance policy without an explanation of the differences between the coverages offered by new carrier and the former carrier violated the parties' contract to procure insurance. The plaintiff also contended that the defendant breached their contract to procure insurance with coverage for sewer and drain backup not "impaired by flooding caused by surface water or general flooding." *Id*. at 437. The

reviewing court affirmed the grant of the defendant's JNOV motion. In its analysis, the court observed that a fax between the parties showed the details of the policies considered and clearly indicated that the chosen insurance policy covered damage from sewer and drain backup. The court noted that the denial by the insurer was not due to lack of coverage, but because the adjuster ruled that the damage was due to flood water. Since the coverage the plaintiff sought was covered, the court found that the defendant did not breach the contract as it procured insurance that complied with the plaintiff's wishes. *Id*. at 438-39.

¶ 135    USI argues that *Industrial Enclosure* stands for the proposition that where

> "a policyholder prevails in coverage litigation against the insurance company, the broker cannot also be liable to the policyholder, because as a matter of simple logic, the existence of coverage negates any claim that any breach by the broker caused the policyholder to lose coverage."

¶ 136    However, USI overstates the holding in *Industrial Enclosure*. The reviewing court found no breach based in part on clear documentation, including a fax between the parties' representatives in which the defendant detailed the coverage for sewer and drain backup. The court did not broadly hold that a policyholder cannot maintain a breach of contract against an insurance broker where insurance coverage is ultimately found to exist. *Industrial Enclosure* also differs from the circumstances of this case on the facts. As discussed, the parties in *Industrial Enclosure* detailed the policies and coverages and the insurance carrier selected by the plaintiff issued the policy. Here, the evidence established that the insurance carrier proposed by USI was later substituted by AIG to a different carrier. The question before the jury was whether the substitution and USI's subsequent actions constituted a breach of contract with the County.

¶ 137    USI also cites *Apollo Label Co. v. Schultz*, 206 Ill. App. 3d 8 (1990), as support for its

argument. However, we find that case inapplicable because no breach of contract claim was at issue. Rather, the plaintiffs pursued claims of breach of a fiduciary duty and a violation of the Consumer Fraud and Deceptive Business Practices Act (now 815 ILCS 505/1 *et seq*. (West 2010)). *Id*. at 10.

¶ 138   Here, the question before us is whether there was any evidence to support a finding of breach of contract by USI as charged to the jury. Given the evidence presented at trial, the jury could have reasonably concluded that USI breached the contract with the County under one of the listed points in the jury instructions. The County presented multiple grounds asserting how USI breached the contract. For example, evidence presented at trial established that Attachment B specifically named Illinois National as the selected excess liability insurer and Attachment B was incorporated into the contract. As discussed above, the County's witnesses explained its position that section 3F impacted the coverage and that USI did not act in the County's best interest or fully review the policy to recognize the implications. Additionally, the County offered Walik's undisputed testimony that when she asked if the change in insurer impacted the policy coverage, a USI employee told her there was no change. USI points to the testimony from its expert Figliulo in which he opined that there was coverage under the policy. However, the jury was not required to accept Figliulo's opinion. "Whether an opinion should be accepted is not for the trial judge but is for the finder of fact." *Peach v. McGovern*, 2019 IL 123156, ¶ 54. The County and USI presented opposing evidence as to whether the change did, in fact, make a difference. While USI offered evidence to counter the County's position, the review and determination as to whether USI breached the contract was within the purview of the jury. On review of the denial of JNOV, we do not reweigh the evidence or evaluate the credibility of the witnesses. *Board of Trustees of Community College District No. 508 v. Coopers & Lybrand*, 208

Ill. 2d 259, 274 (2003). Viewing the evidence in the light most favorable to the County, we reject

the notion that "no contrary verdict based on that evidence could ever stand." See *York*, 222 Ill.

2d at 178. Accordingly, we conclude that the trial court did not err in denying USI's posttrial

motion for JNOV.

¶ 139   Next, USI asserts that the trial court erred in denying its motion for JNOV on the basis

that no evidence was presented to establish that USI breached its contract with the County.

According to USI, the County failed to show that USI breached the contract by failing to change

the name of the insurer on the policy because the contract required Walik, as the head of risk

management, to review and approve the policy and her approval negated any alleged breach by

USI. In response, the County points out that USI's argument is, in essence, its ratification

affirmative defense, but without using the term ratification. In its reply brief, USI denies that this

argument involves ratification, but maintains that it was the County's burden to review and

accept the policy.

¶ 140   We agree with the County that USI's argument constitutes a rephrased version of its

ratification affirmative defense that was presented to the jury at trial. At trial, USI raised multiple

affirmative defenses, including ratification. The jury was instructed as to this affirmative defense

as follows.

>           "USI claims that Cook County's breach of contract claim is barred because each
>
>           of the following is true: (1) at the time Cook County accepted the 2007 [ICSOP]
>
>           policy, Cook County had full knowledge of all the facts, including that the change
>
>           in insurance carriers from Illinois National to [ICSOP] would make a difference
>
>           in insurance coverage; (2) it had the choice to benefit from the switch in carriers
>
>           at the time it accepted the policy; and (3) it knowingly and voluntarily accepted

the benefits from the switch in carriers."

¶ 141   The jury was further instructed:

> "If you find from your consideration of all the evidence that Cook County has proven all the elements of its breach of contract claim against USI and USI does not meet its burden of proving any of its affirmative defenses, then you must find in favor of Cook County, and consider the amount of damages to be awarded as a result of USI's breach."

This affirmative defense was set forth as a verdict interrogatory and the jury answered that the USI did not prove all three were true.

¶ 142   USI now attempts to reframe its rejected affirmative defense as the County's burden to satisfy at trial. According to USI, Walik's approval of the insurance policy negated any breach of contract by USI. It is true that section SC-04 of the contract with USI provided the County with the right to review and approve the procured insurance policy.

¶ 143   Section SC-04 of the contract provides, in relevant part:

> "The Director shall review all Policies and approve them in writing within sixty days after his or her receipt of the proposed Policies. All changes to the terms of the Policies shall be subject to the provisions of this Contract, documented in an appropriate Endorsement and, except where a change will expand coverage without a corresponding change in premium, shall be approved in writing by the Director. In the event the Director declines to approve a policy, the Policy procured by the Contractor shall be canceled and the Contractor shall promptly refund all unearned premiums to the County."

¶ 144   At trial, the jury heard the evidence on this point and found that USI failed to satisfy its

burden. It is uncontested that USI noted the change in insurance carriers to the County when the policy was delivered in June 2007. Walik testified that she received this information and inquired whether the change affected the County's coverage, a USI employee told her the change did not alter coverage. Walik then reviewed and approved the policy. Before this court, USI contends that this action by Walik negated any possible breach by USI with no further discussion. However, USI does not acknowledge the communication by USI that the policy coverage remained the same and thus, the County was not aware of any potentially adverse ramifications at the time the policy was approved. Further, USI's argument attempts to raise an argument that the County never alleged, *i.e.*, that USI directed AIG to switch insurance carriers. The County has never advanced such a claim and the breach of contract allegations do not require such a finding.

¶ 145   Moreover, even if this argument from USI was separate from its ratification affirmative defense, we find the argument unpersuasive. If Walik had failed to approve the policy, as provided in the USI contract, then the contract would be rendered a nullity. Under USI's rationale, the County's approval of the insurance policy, as provided under the contract, would avoid any later discovery of breach by USI, as was raised in this case. This interpretation must be rejected because otherwise USI would never be able to breach the contract and the onus would rest entirely upon the County. Significantly, section SC-04 does not provide for any waiver of a subsequent breach by USI, nor does it provide that the approval of the insurance policy waives any future claims. Here, the County approved the insurance policy based on USI's reassurances that the change did not alter coverage. The evidence about section SC-04 and the County's right to approve the policy was presented to the jury, and we cannot say that the evidence so overwhelmingly favors USI that no contrary verdict could stand. See *Baumrucker*, 2017 IL App

(1st) 161278, ¶ 33.

¶ 146   USI next contends that the County failed to establish that it suffered any damages by a breach of contract. USI bases this contention on the testimony of its expert witnesses, Figliulo and McClure, and asserts that "no reasonable jury could have awarded the County any damages." The County responds that there is no merit to USI's argument that the policies would not allow the amount of claimed damages.

¶ 147   "The basic theory of damages in a breach of contract action requires that a plaintiff 'establish an actual loss or measurable damages resulting from the breach in order to recover.' " *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.,* 216 Ill.2d 100, 149 (2005)). "The proper measure of damages for a breach of contract is the amount of money necessary to place the plaintiff in a position as if the contract had been performed." *Id*. Damages which " 'naturally and generally result from a breach are recoverable.' " *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 89 (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 318 (1987)). "Damages which are not the proximate cause of the breach are not allowed." *Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19.

¶ 148   "An insurance broker has a duty to exercise reasonable skill and diligence in the transaction of business entrusted to him, and a broker who fails to procure insurance when obligated to do so, or who causes damage to his principal, whether by omission or commission, is liable for any loss the principal may sustain by virtue of his failure to procure insurance." *Scarsdale Villas Associates, Ltd. v. Korman Associates Ins. Agency, Inc.*, 178 Ill. App. 3d 261, 264 (1988).

¶ 149   According to USI, the County did not establish damages because the County did not have

a loss in excess of its $10 million SIR. McClure testified at trial that the total amount of the County's settlement payment in the Young Lawsuit that was attributable to the new wrongful acts in 2007 was less than the $10 million SIR under the 2007 policy. McClure opined that since the total amount attributable to the 2007 policy was under the SIR, the County's excess liability insurance would not have been triggered. McClure based this conclusion on his analysis of the number of claimants in the Young Lawsuit with the wrongful acts that occurred under the 2007 policy. USI asserts that McClure's opinion was unrebutted and the County offered no evidence to the contrary. USI argues that the County's reliance on the Young settlement is misplaced because the settlement covered strip searches from 2004 to 2009, not only 2007. Thus, the damages for the 2007 policy did not correspond to the full amount.

¶ 150   However, as the County responds, evidence was presented at the trial detailing the number of individuals strip searched per year by the County, approximately 100,000 individuals, and that the County's liability could extend over a billion dollars. According to the County, "[t]his measure of damages is set at the point of the settlement based on the liability the County faced, not on what happened after the fact during the class claims period." The County contends that McClure's opinion is flawed and USI's argument is misplaced because the opinion was based on the amount of claims filed after the settlement was reached. As the County correctly states, it was required to pay $45 million, after insurance from the 2006 policy period, regardless of how many claims were submitted. The issue of damages was before the jury, who heard the testimony of McClure as well as the County's contrary position. "[A] jury's province as factfinder is not impermissibly invaded even by expert testimony expressed in absolute terms, since jurors remain free to disbelieve and disregard such testimony." *Lange v. Freund*, 367 Ill. App. 3d 641, 651 (2006) (citing *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 545 (1995)). As

evidenced by the jury's damages award, it declined to follow McClure's expert testimony as it was within its right to do so.

¶ 151   USI further relies on Figliulo's testimony that the County received the protection it wanted from the ICSOP policy when it was granted a full release by the Young plaintiffs in the settlement. According to Figliulo, the County's assignment of its rights to the insurance coverage to the Young plaintiffs allowed the County to receive the benefits of the ICSOP policy by reducing the settlement award by $25 million. Figliulo based this figure on the Young plaintiffs prior settlement demand of $80 million compared to the final settlement of $55 million plus the assignment. USI argues that the County failed to rebut this testimony. However, there were different opinions presented at trial as to the value of the assignment, and as previously discussed, it was up to the jury to weigh the evidence and determine whether the County sustained any damages and the amount thereof. When we view the evidence in the light most favorable to the County, we decline to find that "no contrary verdict based on that evidence could ever stand." See *York*, 222 Ill. 2d at 178. Therefore, the trial court correctly denied USI's motion for JNOV on this claim.

¶ 152   Finally, USI argues that the County's damages award should be setoff from the amount received from the insurance companies and the trial court erred in denying its JNOV motion seeking an additional setoff from the judgment award. While the parties agree that the judgment award is subject to a setoff, the parties disagree with the amount of the setoff. USI asserts that the $9.05 million award should be setoff by the full $36.8 million settlement from the AIG Lawsuit, or alternatively, by the $10.8 million the County received from the settlement. Under either amount, the award would be reduced to zero. The County maintains that the proper setoff amount was $1.45 million, which the jury applied in reaching its award. Since the question of the

appropriate setoff was submitted to the jury, USI raised this in its motion for JNOV. We continue to review this issue under the same standard as previous issues. A JNOV will only be granted after we view all of the evidence, with all reasonable inferences from it in its aspect most favorable to the County, and conclude that there is a total failure or lack of evidence to prove any necessary element of the claim. *York*, 222 Ill. 2d at 178.

¶ 153   "Because this is a contract action, a setoff ordinarily would be allowed if a plaintiff was paid more than his damages." *Stendera v. State Farm Fire & Casualty Co.*, 2012 IL App (1st) 111462, ¶ 19. The term "setoff" has two distinct meanings. *Thornton v. Garcini*, 237 Ill. 2d 100, 113 (2010). First, a setoff may refer to a situation when a defendant has a distinct cause of action against the same plaintiff who filed suit against him, which must be raised in the pleadings. *Id*. Second, the term "setoff" refers to a defendant's request for a reduction of a damages award because a third party has already compensated the plaintiff for the same injury. *Id*.

¶ 154   The second meaning is at issue in this case. USI contends that a third party, *i.e.*, the insurance companies, have already compensated the County for the same injury. "Generally, a nonsettling party seeking a setoff bears the burden of proving what portion of a prior settlement was allocated or attributable to its share of the liability." *Id.* at 116.

¶ 155   As previously discussed, in the AIG Lawsuit, the County, along with the Young plaintiffs as its assignees, sued ICSOP, Illinois National, and other AIG entities to recover its $20 million in coverage for the 2007 policy period as well as statutory and punitive damages. Ultimately, the case settled for $52 million. In the settlement agreement, the County and the Young plaintiffs allocated the settlement figures for different damages.

¶ 156   Before we reach the substance of USI's argument, we first recognize the different types of damages involved in the AIG settlement. The County and the Young plaintiffs received the

settlement award comprised of different types of damages: compensatory, punitive, prejudgment interest, and consequential damages for costs incurred by the County. Under USI's argument, all of these forms of damages should be subject to setoff as it relates to the County. The County maintains that the only damages subject to setoff were the allocated compensatory damages.

¶ 157    As pointed out above, "[t]he proper measure of damages for a breach of contract is the amount of money necessary to place the plaintiff in a position as if the contract had been performed." *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19. In contrast, "[p]unitive damages 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " *Slovinski v. Elliot*, 237 Ill. 2d 51, 57-58 (2010) (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)). "[T]he sole purpose of contract damages is to compensate the nonbreaching party, and punitive damages are not available even for a 'wilful' breach of contract." *Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 926 (1995). "Fees, expenses, and punitive damages are not recoverable at common law for breach of contract." *Installco Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 786 (2002) (citing *Cirrincione v. Johnson,* 184 Ill. 2d 109, 114 (1998)).

¶ 158    Kent Ray testified at trial regarding the allocation of the settlement. Under the settlement, $26 million was allocated to the False Claims Act portion. An award under the False Claims Act is subject to treble damages, and Ray testified that the first level was the recovery, and the double and treble damages were punitive. In the settlement agreement, each level was allocated at approximately $8.66 million. Of the first recovery level, the State of Illinois received one-third of the funds, which left $5.77 million. Of this remainder, the County received 25% as required by the Young settlement, which was $1.45 million. The County asserted that the money received

for the second and third recovery level were punitive and not subject to setoff. As to the remaining $26 million in the settlement, there were three allocations: (1) $6 million for the interest on the $20 million of coverage the County did not receive; (2) $6 million in consequential and incidental damages relating to the costs the County spent by not having insurance coverage; and (3) $14 million of value for the County waiving its right to appeal regarding punitive damages. The AIG settlement provided that the County would receive a check for $26 million for the non-False Claims Act awards, and would later receive $10.833 million for the False Claims Act settlement, for a total of $36.8 million. The remaining amount under the False Claims Act portion was divided between the Young plaintiffs and State of Illinois entities. However, the County did not retain the $36.8 million initially received, this amount was divided between the County and the Young plaintiffs. Ultimately, from the $52 million settlement, the Young plaintiffs received $32.5 million and the County received $10.8 million.

¶ 159   USI contends that the trial court erred in denying its motion for JNOV regarding the appropriate setoff amount. USI asks this court to reverse the denial and order a setoff of the award by the full $36.8 million initially received by the County. The County responds that the $36.8 million was not subject to setoff because the County did not keep the full amount, rather the County acted as a "pass-through entity" where 75% of the AIG settlement was transferred to the Young plaintiffs.

¶ 160   USI disagrees with the County's position for two reasons. First, USI asserts that the Young plaintiffs, as assignees of the County, stood in the County's position and, therefore, the full settlement award should be subject to setoff. USI cites two Illinois cases to offer general support for assignment rights, *Hassebrock v. Ceja Corp.*, 2015 IL App (5th) 140037, ¶ 55 ("[o]nce made, an assignment puts the assignee into the shoes of the assignor ... and the assignor

no longer has any rights in the thing assigned"); *Collins Co. v. Carboline Co.*, 125 Ill. 2d 498, 512 (1988) ("an assignment puts the assignee into the shoes of the assignor"), but offers no additional argument connecting the assignment to a setoff in a separate lawsuit.

¶ 161    USI then cites a federal bankruptcy case from Nevada, *In re AgriBioTech, Inc.*, 319 B.R. 207 (D.Nev. 2004), to support its assertion that the County cannot recover damages on the same claims on which the assignees recovered. In that case, the trustee under a creditors' trust as part of a reorganization plan brought claims for fraud and negligence against former officers and directors of the debtor. Those claims had been assigned to the trustee by creditors of the debtor who claimed that the defendants had knowingly misrepresented the debtor's financial condition to them to induce them to deliver products to the debtor. The court rejected the defendants' challenge to the trustee's standing, but also observed once the assignors assigned their rights, they no longer had a right to recover from the defendants on the same fraud claims. *Id*. at 215. In addition to being a nonbinding foreign federal decision, the case did not involve the determination of an appropriate setoff following a settlement with an assignment in a related case. See *Ardon Electric Co., Inc. v. Winterset Construction, Inc.*, 354 Ill. App. 3d 28, 38 (2004) ("this court is not bound by federal decisions"). *AgriBioTech* is also distinguishable from the present case on its facts where the finding was limited to the situation where the assignors could not pursue the same claims for which an assignment had been made. That is not the case here. The County is not attempting to pursue legal claims that it assigned to the Young plaintiffs, but USI wants to apply the conclusion to determining a setoff. USI offers no further argument or authority to explain how the assignment to the Young plaintiffs for the AIG Lawsuit allows for a setoff of the County's award in the present case.

¶ 162    Second, USI contends that since it was not a party to the AIG settlement agreement, the

allocation between the County and the Young plaintiffs should not impact USI in this case. USI

offers a single citation to a federal Seventh Circuit case for the general proposition that a contract

cannot bind a nonparty. See *Northbound Group, Inc. v. Norvax, Inc.*, 795 F.3d 647 (7th Cir.

2015). USI offers no further argument or relevant authority as it relates to the settlement

allocation's impact on the setoff in this case. As previously observed, Supreme Court Rule

341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the

contentions of the appellant and the reasons therefor, with citation of the authorities and the

pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). It is well-settled that a

contention that is supported by some argument but does not cite any authority does not satisfy

the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not

merit consideration on appeal. *Wasleff*, 194 Ill. App. 3d at 155-56. This reviewing court is " 'not

a repository into which an appellant may foist the burden of argument and research.' " *Stenstrom*

*Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1098 (2007) (quoting *Obert v.*

*Saville*, 253 Ill. App. 3d 677, 682 (1993)).

¶ 163   Here, as the party seeking a setoff, it was USI's burden to establish that it was entitled to

a setoff of $36.8 million. USI offers general propositions to support its conclusion that it was

entitled to the full amount as a setoff, but failed to satisfy its burden with relevant authority or

argument explaining why that amount was correct. Accordingly, we decline USI's request for a

setoff of $36.8 million.

¶ 164   As an alternative, USI asserts that it was entitled to a setoff of $10.8 million, which was

the final amount received by the County in the AIG settlement. Absent such a setoff, USI

contends that the County would be receiving a double recovery in violation of Illinois law. USI

relies on Figliulo's testimony that the County drafted the AIG settlement allocation in order to

double recover. Figliulo testified that the AIG settlement should have no impact in the case against USI because USI was not a party to the agreement. He also reasoned that the settlement allocations have no impact on the claims against USI. Figliulo specifically noted the $14 million allocated to waiving an appeal on punitive damages to be questionable because the trial court in the AIG Lawsuit reversed a jury finding of punitive damages and found the evidence was not sufficient for an award of punitive damages. It was Figliulo's opinion that the allocation by the Young plaintiffs and the County was to avoid setoffs in the case against USI. He also did not believe that the County suffered any consequential damages as allocated in that settlement because the County got what it bargained for, a release from the Young Lawsuit. Figliulo conceded that sometimes allocations in a settlement take place between parties when done in good faith that impacts insurance, but the insurance company is not a party to the settlement. USI again argues that Figliulo's expert testimony was unrebutted, noting that the County did not present an expert witness. However, the jury was not obligated to find Figliulo's testimony determinative, jurors remain free to disbelieve and disregard expert testimony." *Lange*, 367 Ill. App. 3d at 651.

¶ 165   The County maintains that the $1.45 million setoff was the appropriate amount based on the compensatory damages it received under the AIG settlement. The County points to Ray's testimony about the allocation of the AIG settlement and what portion was appropriate for a setoff. According to the County, the remaining amount of the settlement was allocated to punitive damages, including the double and treble damages from the False Claims Act, as well as prejudgment interest, and consequential damages and were not subject to setoff. The parties agreed to submit the question of the appropriate setoff to the jury as a question of fact.

¶ 166   In its argument, USI fails to consider the jury's role in determining the appropriate setoff.

65

This court is not being asked to make its own conclusion on the question of the appropriate setoff, but rather we are reviewing the jury's finding under a JNOV review. At trial, the jury was instructed on the issue of the appropriate setoff as follows:

"For its first affirmative defense to damages, USI argues that Cook County's damages should be reduced because Cook County has already received some or all of its damage. USI has the burden of proof for this defense by a preponderance of the evidence. The parties agree that Cook County and the Young Plaintiffs settled certain claims with their insurance companies. You have received evidence of this settlement, including who received what amounts. Whether or not these payments warrant a reduction in damages, which is also known as a setoff, is a matter of dispute in this case and for you to decide.

USI claims that the County's damages should be reduced under the doctrine of setoff. USI argues that it did not cause Cook County's decision to pay a percentage of the settlement to the Young plaintiffs and that the allocation in the settlement agreement with the insurance companies is not reasonable. Cook County claims that it was damaged in the full amount of the settlement payments that it assigned to the Young plaintiffs. Cook County argues that a setoff in that entire amount would not be appropriate because it reasonably mitigated its damages by giving a percentage of that recovery to the Young plaintiffs and because there is an allocation in the settlement agreement with the insurance companies.

Setoff does not apply to the extent that Cook County occurred losses in an event to avoid damages caused by USI's breach. If you find that Cook County

66

incurred costs in making a reasonable effort to avoid losses from USI's breach, you must make an award to Cook County for such costs. You will address these issues in questions 13 and 14 on your verdict."

¶ 167 Question 13 in the jury verdict asked if the jury found that the County "has already recovered some or all of the damages that it claims from USI," and the jury selected yes. In question 14, the jury listed the amount it concluded was the appropriate setoff. The parties agreed to submit this issue to the jury. The jury heard conflicting evidence regarding the appropriate amount for a setoff from both parties. It was within the province of the jury to consider all the evidence on the issue and reach its conclusion. Even if this court were to reach a different conclusion, JNOV is inappropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *York*, 222 Ill. 2d at 178. After reviewing all the evidence presented on this question, we cannot say there was a total lack of evidence to support the jury's conclusion as to the appropriate setoff. Therefore, the trial court properly denied USI's motion for JNOV on this basis.

¶ 168 We now turn to the County's cross-appeal. The County first argues that this court should reverse the trial court's denial of its motion for JNOV as to the amount of damages awarded by the jury, or in the alternative, this court should remand for a new trial on damages only. USI responds that the County's cross-appeal is meritless. As previously discussed, a motion for a JNOV presents " 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case.' " *York*, 222 Ill. 2d at 178 (quoting *Merlo*, 381 Ill. at 311). A JNOV is inappropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Id*.

¶ 169   The County asks this court to enter an *additur* for $32 million in special damages. During the jury trial, the County asked for $32.5 million in special or consequential damages, to reflect the full recovery of the settlement award in the AIG Lawsuit if the County had not assigned its rights in that case to the Young plaintiffs. In its verdict, the jury awarded $500,000. In the alternative, the County seeks a new trial on damages only.

¶ 170   "Courts are rightfully reluctant to interfere with a jury's calculation of damages. But 'where a verdict is legally inconsistent, it should be set aside.' " *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 83 (quoting *Galloway v. Kuhl*, 346 Ill. App. 3d 844, 849 (2004)). "An *additur* may be used to correct an omission of a liquidated damages or an easily calculated item of damage." *Id.* ¶ 84. An *additur* is unavailable where the jury has made credibility determinations based on conflicting testimony. *Id.* "*Additur* is appropriate only to rectify the omission of a liquidated or easily calculated item of damages when the evidence warrants it." *Poliszczuk v. Winkler*, 387 Ill. App. 3d 474, 497 (2008) (citing *Hladish v. Whitman,* 192 Ill. App. 3d 561, 565 (1989)). Significantly, "*additur* is improper if a defendant does not consent to it as an alternative to a new trial." *Hladish*, 192 Ill. App. 3d at 565. Despite advocating for an *additur*, the County fails to acknowledge that this remedy may only be entered if the opposing party consents.

¶ 171   We find the County's reliance on *Ross v. Cortes*, 95 Ill. App. 3d 772 (1981), to be misplaced. In *Ross*, following a trial related to an automobile collision, the jury awarded the plaintiff only the amount of damage paid after insurance, a total of $165, when the plaintiff was requesting fixed damages for a paid repair bill in the amount of $3,566.64. The reviewing court acknowledged the importance of " 'a fair and efficient administration of justice.' " *Id*. at 777 (quoting J. Cole, Additur Procedural Boon Or Constitutional Calamity, 17 DePaul L.Rev. 175,

193 (1967)). "In our opinion the case before us presents a situation in which the additur qualifies as a workable device to bring the within litigation to a speedy end." *Id.* The reviewing court did not remand the case to the trial court, but instead ordered that if the defendants did not file their consent to an *additur* within 30 days, the cause would be remanded for a new trial on damages. *Id.* at 778.

¶ 172   Unlike the instant case, *Ross* involved the costs of a car repair and the jury entering an award for the amount paid after insurance. In *Ross*, there was no credibility of witnesses involved or dispute of the bill. That is not true in this case where the credibility of witnesses was a significant issue in the case. Since an *additur* is unavailable when the jury has made credibility findings based on conflicting testimony, we decline to enter an *additur* on the special damages award.

¶ 173   Alternatively, the County asks this court to remand for a new trial on special damages only. "A new trial on damages may be ordered where (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability." *State Farm Mutual Insurance Co. v. Ellison*, 354 Ill. App. 3d 387, 390 (2004).

¶ 174   We find that these requirements have not been met in this case and preclude a new trial on special damages only. The special damages sought by the County is the amount of the AIG settlement received by the Young plaintiffs under the theory that if the County's insurer had provided coverage, then the County would not have had to assign its rights in the AIG Lawsuit.

This theory is not separate and distinct from the question of liability, and such a new trial on this claim for damages would be unfair to USI. Moreover, while we have upheld the jury's finding of liability against USI, we cannot say that this finding was "*amply* supported by the evidence." (Emphasis added.) The question of liability involved conflicting positions and evidence to support both parties. Accordingly, we decline to remand this case for a new trial on special damages.

¶ 175   The County next contends that the trial court erred in denying its JNOV motion to reverse the jury's finding that the County failed to mitigate its damages. Specifically, the County asserts that USI's mitigation defense was based on the faulty premise that the County should have stopped its strip searches earlier, but the County maintains that this theory would only be valid after the insurance companies denied coverage. USI maintains that the County could have engaged in several actions to mitigate its damages. As previously stated, this court "has no right to enter a [JNOV], if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454.

¶ 176   "Pursuant to the common-law doctrine of mitigation of damages, a plaintiff asserting a breach of contract claim cannot recover losses that it could have reasonably avoided." *Takiff Properties Group Ltd. #2 v. GTI Life, Inc.*, 2018 IL App (1st) 171477, ¶ 15. The mitigation doctrine is an affirmative defense that must pleaded and proven by the defendant. *Id*. "The duty to mitigate damages imposes a duty on the injured party to ' "exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted." ' " *Amalgamated Bank of Chicago v. Kalmus & Associates, Inc.*, 318 Ill. App. 3d 648,

658-59 (2000) (quoting *Tsoukas v. Lapid,* 315 Ill. App. 3d 372, 377 (2000), quoting Black's Law Dictionary 904 (5th ed.1979)).

¶ 177   The County contends that the duty to mitigate did not accrue until after the injury occurred, which it asserts was in 2010 when ICSOP denied coverage for the Young Lawsuit. However, the Illinois Supreme Court in *Krop* found that "insurance customers are injured as soon as an insurance producer delivers a policy that does not conform to the customers' request." *Krop*, 2018 IL 122556, ¶ 35. While we have previously concluded that the statute of limitations did not begin to run at that time, the injury, *i.e.*, the breach, still occurred when USI delivered an insurance policy that did not conform with the parties' contract. Therefore, once the County was injured, it had "a duty of making reasonable exertions to render the injury as light as possible." *Culligan Rock River Water Conditioning Co. v. Gearhart*, 111 Ill. App. 3d 254, 258 (1982). "If, by this negligence or wilfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him." *Id.*

¶ 178   As explained in the Restatement (Second) of Contracts:

> "It is sometimes said that it is the 'duty' of the aggrieved party to mitigate damages, but this is misleading because he incurs no liability for his failure to act. The amount of loss that he could reasonably have avoided by stopping performance, making substitute arrangements or otherwise is simply subtracted from the amount that would otherwise have been recoverable as damages." Restatement (Second) of Contracts § 350, Comment b., (1981).

¶ 179   At trial, USI offered evidence to show that the County failed to mitigate its damages in multiple ways: (1) the County forfeited its claims to the insurance proceeds of $10 million from its 2008 policy period policy in the AIG Lawsuit; (2) the County continued its strip search policy

after the Young Lawsuit had been filed and after the breach by USI occurred in June 2007; (3) approving the ICSOP policy in June 2007; (4) the County failed to settle the Young Lawsuit earlier and for a smaller settlement amount; and (5) assigning its rights and claims to the insurance to the Young plaintiffs. The County asserts that none of these reasons constituted a valid basis for mitigation. In regard to the continued strip search policy, the County maintains that "[c]onducting the very activity that the County purchased insurance for can hardly be considered a failure to mitigate." However, this argument was premised on the mistaken belief that the injury occurred in 2010 when the insurance coverage was denied, rather than in 2007.

¶ 180    The jury heard and weighed the evidence of mitigation before finding that the County failed to mitigate its damages. The question before us is simply whether when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to USI, there is a total failure or lack of evidence to prove any necessary element of USI's affirmative defense. See *York*, 222 Ill. 2d at 178. Under this standard, we cannot say that such a failure occurred in this case. Accordingly, the trial court properly denied the County's motion for JNOV on the mitigation finding in favor of USI.

¶ 181    Finally, the County argues that the trial court's verdict in favor of USI on the breach of fiduciary duty claim was against the manifest weight of the evidence. Specifically, the County contends that USI's "unilateral decision to use County's premium dollars to buy an insurance policy from ICSOP instead of Illinois National constituted a misappropriation of the County's money." According to the County, an "insurance producer engages in misappropriation, and thereby breaches its fiduciary duty to the consumer, by placing premiums with an insurer when that placement is not in the best interest of the consumer." USI responds that the County failed to establish that the trial court's findings of fact should be reversed under the deferential manifest

weight standard. USI initially asserts that the County's claim of breach of fiduciary duty is time barred, but we have already resolved this issue and concluded that the County's complaint was timely filed.

¶ 182   "In a bench trial, the trial court must weigh the evidence and make findings of fact. In close cases, where findings of fact depend on the credibility of witnesses, it is particularly true that a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). " A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id*. at 252. " 'The court on review must not substitute its judgment for that of the trier of fact.' " *Id*. (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)).

¶ 183   Section 2-2201 of the Insurance Placement Liability Act provides in relevant part:

"(a) An insurance producer, registered firm, and limited insurance representative shall exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested by the insured or proposed insured.

(b) No cause of action brought by any person or entity against any insurance producer, registered firm, or limited insurance representative concerning the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance shall subject the insurance producer, registered firm, or limited insurance representative to civil liability under standards governing the conduct of a fiduciary or a fiduciary relationship except when the conduct upon which the cause of action is based involves the wrongful retention or misappropriation by the insurance producer, registered firm, or

73

limited insurance representative of any money that was received as premiums, as a premium deposit, or as payment of a claim." 735 ILCS 5/2-2201(a), (b) (West 2010).

¶ 184   Under section 2-2201(b), an insurance producer can only be liable for a breach of fiduciary duty when the conduct involves the misappropriation of any money, such as a premium. The supreme court has found that "anyone who is required to be licensed to sell, solicit, or negotiate insurance, including both agents and brokers, are considered insurance producers." *Austin Highlands*, 2020 IL App (1st) 191125, ¶ 14 (citing *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶¶ 29, 43). "To state a claim for breach of fiduciary duty, it must be alleged and ultimately proved: (1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. Therefore, the County was required to prove that USI misappropriated the money received as a premium for the Illinois National policy.

¶ 185   The evidence at the bench trial established that once the County and USI entered into a contract for the procurement of insurance, the County submitted approximately $1.4 million to USI as payment for the premium of the Illinois National policy. In turn, USI forwarded the payment to Tri-City, the wholesale broker that served as AIG's agent. Tri-City then sent the payment on to AIG for the Illinois National policy. A binder for the Illinois National policy was issued, effective on December 31, 2006, until the full policy was delivered. These facts are uncontested. Illinois National was the County's insurer and accepted claims while the binder was in effect. The policy was not canceled for nonpayment, nor were any claims denied for nonpayment.

¶ 186    The County contends that USI did not use the premium to purchase an Illinois National policy, and such policy was in the best interest of the County. According to the County, USI used the premium to purchase the ICSOP policy, which replaced the Illinois National binder. The County asserts that the purchase of the ICSOP policy with the County's premium resulted in the loss of $20 million in insurance coverage and this action is sufficient to establish a breach of fiduciary duty under section 2-2201. The County does not discuss the elements of a breach of fiduciary duty, nor whether those elements were proven here.

¶ 187    The County cites *DOD Technologies v. Mesirow Insurance Services, Inc.*, 381 Ill. App. 3d 1042 (2008), as support for its claim. However, we find *DOD* to be distinguishable from the present case. First, we point out that *DOD* was an appeal from the dismissal of complaint, not an appeal after a bench trial. *Id*. at 1044. The difference in the standard of review is significant. The dismissal of complaint is reviewed *de novo* (*id*. at 1045), while this court must employ the more deferential manifest weight standard (*Eychaner*, 202 Ill. 2d at 251).  Second, the insurance broker in *DOD* was alleged to have received contingent commissions based on the aggregate business referred to the insurer. The complaint alleged that "these undisclosed incentives caused defendant to refer business to a paying insurer even if the policy and rates quoted by that insurer were not the most advantageous for the customer." *DOD*, 381 Ill. App. 3d at 1049. The reviewing court held that "a producer misappropriates premiums within the terms of section 2-2201 when it directs a premium to an insurer, the price or coverage is not in the customer's best interest, and the placement earns the producer undisclosed contingent incentives." *Id*.

¶ 188    Here, no allegation was made nor was any evidence introduced at trial that USI earned any undisclosed contingent incentives in the placement of the policy with ICSOP. Further, the trial court expressly found that the change in the insurer was made by AIG, unbeknownst to USI.

"Thereafter, in May 2007, AIG substituted a policy from ICSOP, another AIG company, for the Illinois National Policy. AIG did not inform Cook County or USI of the switch. No additional premiums or brokerage commissions were paid by Cook County or by USI for the new policy. The evidence is unclear why AIG changed the insurance carrier. There is no evidence that USI directed, asked for, or knew AIG intended to-and did-substitute one of its carriers for another until after the change had been made. The USI representative at this trial testified that, regardless of the reason for the switch, it made no difference for coverage purposes because both Illinois National and ICSOP were AIG companies. He testified he told that to Cook County after he learned of the change."

¶ 189   The County has offered no case law showing that a breach of fiduciary duty can be supported when the insurance broker does not receive any improper incentives and the change of the insurance carrier was directed by the insurance company, not the broker. The evidence at trial failed to show that USI misappropriated the County's premium. The premium was forwarded through Tri-City to AIG without any issue. The subsequent substitution in carrier was not done by USI and no additional premium or commission was involved in the change. Thus, we find that the trial court's ruling in favor of USI on the breach of fiduciary duty claim was not against the manifest weight of the evidence.

¶ 190   We lastly address one motion from USI that was taken with the case. USI moved for leave to correct the County's misrepresentation of the record, specifically in regard to an assertion by the County that USI failed to challenge the breach of fiduciary duty claim as time barred in the trial court. Since we have addressed this claim in our decision, the motion is not considered.

76

¶ 191   Based on the foregoing reasons, we affirm the decision of the circuit court of Cook

County.

¶ 192   Affirmed.